**Janet PETERSON, Plaintiff and Appellant,**

v.

**THE SUNRIDER CORPORATION, dba Sunrider International and Tei Fu Chen, Defendants and Appellees.**

**No. 20000385.**

Supreme Court of Utah.

April 26, 2002.

---

Thomas W. Seiler, Jared L. Anderson, D. Scott Davis, Provo, for plaintiff.

H. Thomas Stevenson, Brad C. Smith, Ogden, for defendant.

DURHAM, Chief Justice.

### INTRODUCTION

¶1 This appeal arises from a breach of contract action. Appellant Janet Peterson (Peterson) claims the right to receive commissions from appellee, Sunrider Corporation (Sunrider), for sales made by a particular group of Sunrider distributors, pursuant to a contract executed in 1976. Commissions were paid from 1976 to 1994, but in 1994 Sunrider ceased making regular payments under the agreement and Peterson sued. On cross-motions for summary judgment, the trial court denied Peterson's motion for sum-

mary judgment and dismissed the claim, finding as a matter of law that the agreement constituted an illegal contract under the Pyramid Scheme Act, Utah Code Ann. §§ 76–6a–1 to –6 (2001), and was therefore unenforceable. We reverse the summary judgment order dismissing Peterson's claim, affirm the denial of her motion for summary judgment, and remand.

## BACKGROUND

¶ 2 Sunrider[1] is a Utah corporation that sells herbs, dietary supplements, skin care products and beauty aids through a multi-level marketing plan. The plan includes several "levels of achievement" through which participants may receive compensation based both on their own sales of company products and on the sales of those whom participants have "sponsored," that is, those whom participants have brought into the company. Participants receive "overrides," or commissions, based on the sales of groups of distributors who are at a lower level in the hierarchy and who were personally sponsored by the participant. In addition, participants who achieve the level of associate director or higher are eligible for a "Leadership Development Bonus" (Bonus), based upon the cumulative sales of directors and associate directors sponsored by the participant.

¶ 3 A percentage of the company's overall sales volume is set aside to pay the bonuses. The precise method of calculating individual bonuses is changed regularly by the company. These changes are published in "business guides,"[2] which are made available to participants. The business guides also outline the prerequisites to becoming eligible for the Bonus. Although the specific requirements for director status change over time, participants are generally required to buy a certain amount of the company's products,

called "personal purchase volume," and to make efforts to encourage distributors at lower levels to make sales.

¶ 4 In 1976, Ken Murdock, then president of the company, and Lloyd Peterson, the husband of the appellant, executed a written agreement designating Mrs. Peterson as the beneficiary of overrides resulting from a distributorship known as the John and Sharon Farnsworth organization. The agreement states that, in exchange for $1,500, the Farnsworth organization "will become first level distributors or directors as the case may be to ... Janet S. Peterson" to function "as though [the Farnsworth organization] had been originally directly sponsored by Janet S. Peterson." In addition, the agreement provides that Peterson "will remain a director with the company for the purpose of receiving overrides from directors occurring to her organization regardless of her personal purchase volume (PV) level.... [H]owever, her personal group PV for those below director level will be paid at the scheduled rate for the PV level reached each month." The agreement was signed by Mr. Peterson and Murdock; Mrs. Peterson was not a party.

¶ 5 For 18 years, Peterson received monthly payments from Sunrider based upon the sales of the Farnsworth organization, the overall sales volume of Sunrider, and the scheduled rates established by Sunrider for the time period. The payments varied in amount, but were generally slightly more or less than $3,500 a month at the time the payments were stopped. During this time, Peterson received the Bonus without having to meet any of the performance requirements for directors. Peterson states that she was aware of the director requirements outlined in the business guides,[3] but that she believed

---

1. The company was incorporated May 27, 1976, under the name NaturaLife International, Inc. Tei Fu Chen purchased all of the company stock in September, 1982, and thereafter changed the company name to Sunrider International.

2. The business guides have had various names since the company was started; but each has generally served the same purpose—to outline the structure of the multi-level marketing plan

and to update the various programs and potential methods of getting compensation.

3. Peterson states she stayed abreast of the director requirements so that she could qualify for overrides that came from a different distributorship (unrelated to the Farnsworth organization), which she personally sponsored. She sought to meet the director requirements only with regard to this other distributorship.

that the requirements had been waived for her by the 1976 agreement.

¶ 6 In 1982, Tei Fu Chen (Mr. Chen) purchased all of the company stock. Mr. Chen claims that at the time of the sale he did not know of the agreement with Peterson. At some point after 1986, a random audit by Sunrider's accounting department revealed that Peterson was receiving Bonus payments without complying with the director requirements. Mr. Chen was informed that Peterson was not qualifying and decided to allow her a grace period to qualify; however, he states that he subsequently "forgot" about the situation. Some time after this, Oi-Lin Chen (Mrs. Chen), the current president of the company, became aware that Peterson was not qualifying and stopped the payments as of December 1994.

¶ 7 In her amended complaint, Peterson brought claims against both Sunrider and Mr. Chen ("defendants") for breach of contract and against Mr. Chen for intentional interference with contractual relations. After discovery, Peterson moved for partial summary judgment, asking the court to rule in her favor as a matter of law on the breach of contract claim. The defendants moved for summary judgment and dismissal of all the claims.

¶ 8 In denying Peterson's motion for partial summary judgment, the trial court cited *Webb v. R.O.A. Gen. Inc.*, 804 P.2d 547 (Utah Ct.App.1991), and held that the terms of the contract were not "complete, clear, and unambiguous." *Id.* at 547 (quoting *Colonial Leasing Co. v. Larsen Bros. Constr.*, 731 P.2d 483, 488 (Utah 1986)). The court identified two disputed questions of material fact. First, the court noted that the parties disagree about which business guides should be used to interpret the 1976 writing. The defendants argue that the agreement is not complete on its face and should be read to incorporate the terms included in each new business guide. In the alternative, they contend that because Peterson received both the benefits and detriments of changes to the

business guides without complaint, she implicitly accepted the business guides as superseding the 1976 contract.[4] Peterson admits that the agreement does not define the specific payment schedule to be used in determining her Bonus; however, she argues that the contract should be read with reference to the 1978 business guide, since that guide maintains the same payment schedule as existed when the contract was executed. She contends that there has been neither consideration nor a meeting of the minds to effect a modification of the agreement according to the more recent business guides.

¶ 9 Second, the court concluded that the parties dispute whether the 1976 agreement waived all director requirements or only the requirement of maintaining a specific personal purchase volume. Based on extrinsic evidence, Peterson argues that the parties to the contract intended the agreement to waive all director requirements. Defendants argue that the contract on its face waives only the one requirement. They argue that extrinsic evidence of the intent of the contracting parties is prohibited in this case by the parol evidence rule. In the alternative, defendants assert that the 1976 agreement was superseded by subsequent business guides, which affirm all requirements for director status.

¶ 10 The trial court then granted defendants' motion for summary judgment and dismissal. With regard to the intentional interference with contract claim, the court concluded that Peterson had failed to explain how Mr. Chen, by discussing with his employees the possibility of terminating Peterson's payments, had acted maliciously, outside the scope of his powers, or against the interests of the company. The court held that there were no material facts in dispute surrounding Mr. Chen's actions and the interests of the company. With regard to the breach of contract claim against Mr. Chen, the court held that Peterson had offered no evidence that Mr. Chen personally assumed liability for the 1976 contract. Peterson's assertion that Mr. Chen had become the sole

4. Defendants state that Peterson implicitly acknowledged that Sunrider could change the terms of the contract by changing the business guides. They point to Peterson's testimony that Sunrider "could" make changes to the business guides "when they want—if they feel that things aren't quite right...."

shareholder of Sunrider was undisputed; however, the court stated, share ownership alone is insufficient cause to hold a stockholder liable for the actions of his company.

¶ 11 Finally, with regard to the breach of contract claim against Sunrider, the court held that the 1976 agreement serves an illegal purpose and is therefore unenforceable. Relying upon Utah Code section 76–6a–2 (2002) and federal case law, the court held as a matter of law that "receiving bonuses in a multi-level marketing business is illegal when the bonuses are based only upon sponsorship of an organization, rather than promoting a product, selling a product, or training and supervising down-line distributors." While acknowledging that Peterson did not personally recruit people into the Farnsworth organization and that Peterson's bonuses were based on sales rather than recruitment, the court found that the contract allowed Peterson to receive payments without making retail sales or fulfilling other obligations. If such a contract were enforced, the court stated, Peterson would reap the benefits of Sunrider's compliance with anti-pyramid scheme laws without having to comply with the law herself. Stating that "[t]he Court cannot enforce an illegal contract," the trial court dismissed Peterson's claim for breach of contract.

¶ 12 On appeal, Peterson argues that the trial court erred by denying her motion for summary judgment on the breach of contract claim against Sunrider and by granting the defendant's motion to summarily dismiss the same claim.[5] She contends that (1) the trial court misinterpreted the Pyramid Scheme Act (the Act) in finding the contract illegal and unenforceable; (2) even if the trial court correctly interpreted the Act, the Act should not be applied to a contract that was executed prior to its enactment; and (3) because the contract is legal and has not been modified, no genuine issues of material fact remain on the question of whether Sunrider breached it.

5. Appellant has not challenged the trial court's dismissal of the claims against Mr. Chen, and

## STANDARD OF REVIEW

¶ 13 Summary judgment is appropriate when no genuine issues of material fact exist and the moving party is entitled to judgment as a matter of law. Utah R. Civ. P. 56(c); e.g., Ward v. Intermountain Farmers Ass'n, 907 P.2d 264, 266 (Utah 1995). "Because entitlement to summary judgment is a question of law, we accord no deference to the trial court's resolution of the legal issues presented." Id. "[I]n reviewing a grant of summary judgment, we view the facts and all reasonable inferences drawn therefrom in the light most favorable to the nonmoving party." Id. at 265 (quoting Higgins v. Salt Lake County, 855 P.2d 231, 233 (Utah 1993)).

¶ 14 In reviewing a trial court's contract interpretation, we defer to the trial court on questions of fact but not on questions of law. In Kimball v. Campbell, 699 P.2d 714 (Utah 1985), we stated the rule:

A contract's interpretation may be either a question of law, determined by the words of the agreement, or a question of fact, determined by extrinsic evidence of intent. If a trial court interprets a contract as a matter of law, we accord its construction no particular weight, reviewing its action under a correctness standard. However, if the contract is not an integration or is ambiguous and the trial court proceeds to find facts respecting the intentions of the parties based on extrinsic evidence, then our review is strictly limited.

Id. at 716 (citation omitted); see also 50 W. Broadway Assocs. v. Redevelopment Agency of Salt Lake City, 784 P.2d 1162, 1172 (Utah 1989). Whether a contract is ambiguous is a question of law, which we review for correctness. Interwest Constr. v. Palmer, 923 P.2d 1350, 1358 (Utah 1996); see also Faulkner v. Farnsworth, 665 P.2d 1292, 1293 (Utah 1983). Moreover, "a motion for summary judgment may not be granted if a legal conclusion is reached that an ambiguity exists in the contract and there is a factual issue as to what the parties intended." Faulkner, 665 P.2d at 1293.

they are therefore not at issue in this appeal.

¶ 15 We also review the trial court's interpretation of the Pyramid Scheme Act, Utah Code Ann. §§ 76–6a–1 to –6 (2002). "The interpretation of a statute is a question of law, which we review for correctness." *Provo City v. Cannon*, 1999 UT App 344, ¶ 5, 994 P.2d 206 (quoting *State v. Lowder*, 889 P.2d 412, 413 (Utah 1994)).

## ANALYSIS

### I. PETERSON'S MOTION FOR PARTIAL SUMMARY JUDGMENT

¶ 16 Peterson argues that the contract is valid and enforceable, that it entitles her to override payments regardless of the director requirements that existed when the contract was executed or that have been established by subsequent business guides, and that Sunrider breached the contract when it failed to continue making Bonus payments to her. She contends that because the terms of the agreement are sufficiently clear, and because there has been no formal modification of the agreement, she is entitled to judgment as a matter of law.

¶ 17 The defendants respond by arguing, first, that the agreement is ambiguous on its face and must be read to integrate each new business guide. Each new business guide, they assert, establishes anew the requirements Peterson must fulfill in order to receive the Bonus. In the alternative, defendants argue that because Peterson accepted payments in various amounts according to adjusted formulae contained in the business guides, she implicitly accepted the business guides in totality as superseding the 1976 contract. Therefore, they contend, she must meet the requirements outlined in each new guide.

¶ 18 In construing a contract, the intention of the contracting parties is controlling. *E.g., Winegar v. Froerer Corp.*, 813 P.2d 104, 108 (Utah 1991). If the language of the contract is unambiguous, the intention of the parties may be determined as a matter of law based on the language of the agreement. *Id.* If the contract is found to be ambiguous, the court may consider extrinsic evidence of the parties' intentions. *Id.; see*

*also Ward*, 907 P.2d at 268; *Interwest*, 923 P.2d at 1359; *Faulkner*, 665 P.2d at 1293.

¶ 19 "A contract provision is ambiguous if it is capable of more than one reasonable interpretation because of 'uncertain meanings of terms, missing terms or other facial deficiencies.' " *Interwest*, 923 P.2d at 1359 (quoting *Winegar*, 813 P.2d at 108). In determining whether a contract is ambiguous the court is not bound to consider only the language of the contract. "[A]ny relevant evidence must be considered" so that the court "can 'place itself in the same situation the parties found themselves at the time of contracting.' " *Ward*, 907 P.2d at 268 (quoting *Pac. Gas & Elec. Co. v. G.W. Thomas Drayage & Rigging Co.*, 69 Cal.2d 33, 69 Cal.Rptr. 561, 442 P.2d 641, 645 (1968)). "The only evidence relevant to that inquiry is evidence of the facts known to the parties at the time they entered the [agreement]." *Yeargin, Inc., v. Utah State Tax Comm'n*, 2001 UT 11, ¶ 39, 20 P.3d 287. In *Ward* we specified the functional import of extrinsic evidence:

> If after considering such evidence the court determines that the interpretations contended for are reasonably supported by the language of the contract, then extrinsic evidence is admissible to clarify the ambiguous terms. Conversely, if after considering such evidence, the court determines that the language of the contract is not ambiguous, then the parties' intentions must be determined solely from the language of the contract.

*Ward*, 907 P.2d at 268 (citations omitted).

¶ 20 The contract at issue consists of two parts. The first section of the contract was signed by Peterson's husband, Lloyd Peterson:

> I, Lloyd D. Peterson, do hereby offer to purchase from NaturaLife International the NaturaLife Distributors known as Sharon and John Farnsworth (husband and wife) and their sponsored organization for the sum of $1500 (one thousand five hundred dollars).... [T]his purchase will become effective at 11:59 p.m. on July 31, 1976, and from that time on, the above Farnsworth NaturaLife organization will

become first level distributors or directors as the case may be to my wife, Janet S. Peterson. It is also specified that my wife, Janet Peterson, will remain a director with the company for the purpose of receiving overrides from directors occurring to her organization regardless of her personal purchase volume (PV) level. I do understand, however, that her personal group PV for those below director level will be paid at the scheduled rate for the PV level reached each month.

The second part was signed by Murdock, who was then president of the company:

The NaturaLife International company accepts the offer of Lloyd D. Peterson for the purpose of the sponsorship of John and Sharon Farnsworth and their sponsored organization as distributors and/or directors as though they had been originally directly sponsored by Janet S. Peterson. The purchase price and terms are approved as written in the proposal.

¶ 21 There are obviously a number of terms left undefined by the contract. The agreement does not define "overrides," "personal purchase volume (PV) level," or "personal group PV", nor does it explain the significance of the Farnsworth organization becoming "first level distributors or directors as the case may be" to Peterson. These ambiguities, however, may easily be clarified by extrinsic evidence.[6] Indeed, the parties do not dispute the general meanings of these terms.

¶ 22 There is, however, at least one [7] crucial issue left unsettled by the contract: it does not specify the requirements, if any, Peterson must meet in order to be eligible for overrides. The contract explicitly waives requirements related to her "personal purchase volume (PV) level." At the time the contract was executed, there were in place several requirements in addition to the PV requirement that had to be met in order to qualify for the Bonus. Presumably, if Peterson had "originally directly sponsored" the Farnsworth organization, she would not have been exempt from these other requirements.[8]

¶ 23 On the other hand, the contract can be read as reflecting an intent to waive all director requirements, even though it refers explicitly only to the personal purchase volume threshold issue. This reading is supported by the actions of the parties in proceeding under the contract. Peterson received payments for 18 years without any effort by either party to acknowledge or require Peterson's compliance with director requirements. Furthermore, Murdock, who executed the contract, testified in his deposition that the agreement was intended to waive all director requirements.[9] This inter-

---

6. It is reasonable to assume that the original parties used these terms with the same basic meanings as were later spelled out in the business guides. The business guides use the term "overrides" to refer to bonuses paid to those who have reached director status. "Purchase volume" refers to the amount of company products that have been purchased, based on dollar amounts assigned to each product by the company. "Personal purchase volume (PV) level" is used to refer to the dollar value of products bought by an individual, whereas "personal group PV" refers to the value of products bought by those whom the participant sponsored. Under the plan, those whom a director has personally sponsored are "first level" distributors or directors. Directors receive greater commissions from sales made by "first level" distributors than sales made by others in the organization.

7. The trial court also noted that the parties dispute whether the contract should be read with reference to the 1978 business guide, which em-

ploys the same requirements and payment scale as existed in 1976, or the most recent business guide. "[T]he fact that the parties differ as to the interpretation of an agreement does not alone establish that ambiguity exists." *Winegar*, 813 P.2d at 109. Nonetheless, because the agreement itself contemplates regular payments being made to Peterson yet gives no indication of how the payments are to be calculated, the contract is ambiguous in this regard as well.

8. Defendants also argue that Peterson failed to meet general distributor requirements, which are not explicitly waived, or even addressed, by the agreement. Peterson claims that these requirements were not in existence at the time the contract was executed and therefore do not apply to her.

9. Defendants object to Murdock's testimony on three grounds: First, they claim that because the contract, in conjunction with the most recent business guide, constitutes an integrated agreement, parol evidence is not admissible to contra-

pretation of the contract is certainly one that is "reasonably supported by the language of the contract." *Ward*, 907 P.2d at 268. Therefore, "extrinsic evidence is admissible to clarify the ambiguous terms." *Id.*

¶ 24 Having determined that the contract is ambiguous and that extrinsic evidence is admissible,[10] we must next determine whether there are any issues of fact as to what the parties intended. Where a contract is ambiguous, summary judgment is appropriate only if the evidence, when viewed in the light most favorable to the nonmoving party, leaves no genuine issues of fact to be resolved.

¶ 25 As discussed above, there is conflicting evidence with regard to the extent to which the contract was intended to waive director requirements. Viewing the evidence

in the light most favorable to defendants, a factfinder could find, based on the language of the agreement and the requirements in existence in 1976, that the contract did not waive all of the director requirements. If this is the case, and if Peterson failed to meet the remaining requirements, the factfinder could determine that Peterson was ineligible for the Bonus and that Sunrider did not breach the contract by stopping Peterson's override payments. Thus, the trial court did not err in denying Peterson's motion for partial summary judgment.

## II. DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND TO DISMISS

¶ 26 After refusing Peterson's motion on the grounds that there were disputed issues of fact about the meaning of the contract, the

---

dict the written expression of the contract. As discussed below, *see* note 10 *infra*, we hold that the court could not properly find such an integrated contract at this stage in the proceedings. Furthermore, it seems apparent that Murdock's testimony serves merely to supplement, rather than contradict, the terms of the agreement. Murdock did not dispute the waiver of the PV requirement; he merely stated that other requirements were waived as well.

Second, defendants argue that because some of Murdock's testimony is in conflict with Peterson's earlier testimony, she should be estopped from relying upon it. Defendants cite no authority in support of this claim, nor do they specify in what way Murdock's testimony is in conflict with Peterson's claims. We decline to address this claim because it has not been properly briefed. *See, e.g., State v. Bishop*, 753 P.2d 439, 450 (Utah 1988) (noting that we are not a " 'depository in which a party may drop the burden of argument and research.' " (quoting *Williamson v. Opsahl*, 92 Ill.App.3d 1087, 48 Ill.Dec. 510, 416 N.E.2d 783, 784 (1981))). A single, vague sentence without citation to the record or legal authority is inadequate.

Finally, defendants contend that in her Motion in Opposition to Defendants' Motion for Summary Judgment, Peterson failed to respond to defendants' claim that parol evidence is inadmissible. Therefore, they state, Peterson waived her right to address this issue on appeal. Although Peterson did not directly address parol evidence, she disputed defendants' underlying claim that the contract in combination with the most recent business guide constitutes an integrated agreement. Further, since the trial court never held that parol evidence was inadmissable, Peterson was not obliged at that stage to either address the issue or waive it.

10. Defendants argue that the 1976 writing, together with the most recent business guide, constitutes an integrated agreement. Therefore, they contend, the court may not consider extrinsic evidence of the parties' intent. However, it would be inappropriate for the court to find such an integration on a motion for summary judgment. Whether the contract, in combination with the most recent business guide, is a complete integration cannot be determined without first determining whether the contract is an integration by itself. After finding the contract is ambiguous, the court is left with a question of fact regarding whether the parties intended to integrate each new business guide. This is by no means clearly established. Defendants' position is repudiated not only by the testimony of Murdock, but by the plain language of the contract, which makes no reference to changes in the business guides. The fact that several of the business guides contained integration or merger clauses does not dispose of this issue. The court is still left with a question of fact of whether the agreement was intended to reference each new business guide.

Defendants also argue that because Peterson accepted payments in various amounts according to terms set out in the business guides, she implicitly accepted the business guides as superseding the 1976 contract. Once again, this is not a question that can be resolved on a motion for summary judgment. Whether Peterson's acceptance of the checks constitutes a waiver of her immunity from director requirements is a question of fact yet to be determined. A factfinder may note that while Peterson did accept payment in various amounts based on the formula in the business guides, she apparently made no implicit acceptance of the changes in director requirements in the guides.

trial court granted defendants' motion for summary judgment and to dismiss on the grounds that the contract was illegal and unenforceable as a matter of law.

¶ 27 Finding a contract illegal and unenforceable based on a penal statute requires three steps. The court must determine (1) what the terms of the contract are; (2) what the statute prohibits; and (3) whether the statute or public policy demands that the contract be deemed unenforceable. *See generally* 6A *Corbin on Contracts* §§ 1373–1378 (1962).

### A. The Terms of the Contract

¶ 28 Although the trial court did not explicitly make a finding of what the terms of the contract are, we assume that it determined that the contract serves the prohibited purpose it identified, namely that the terms of the contract allow Peterson to receive bonuses based only upon sponsorship of an organization, rather than promotion of a product, sale of a product, or the training and supervision of down-line distributors. This reading of the contract implicitly adopts Peterson's position that the contract relieved her of all of the director requirements.

¶ 29 Because the meaning of the contract has not yet been resolved, however, the trial court's reliance on one construction of it to support summary judgment was improper. Where, as here, the court has determined that the contract is ambiguous and there are issues of fact regarding the intention of the parties, summary judgment may not be granted based on contract interpretation.[11] *Faulkner v. Farnsworth*, 665 P.2d 1292, 1293.

The trial court therefore improperly relied upon a disputed interpretation of the contract in granting defendants' motion for summary judgment.

### B. Statutory Interpretation [12]

¶ 30 The trial court's procedural error constitutes grounds for reversing its order of dismissal. We go on to address the Pyramid Scheme Act, however, because proper construction of the Act may be necessary in deciding the case on remand. *See* Utah R.App. P. 30(a) (2001) ("If a new trial is granted, the court may pass upon and determine all questions of law involved in the case presented upon the appeal and necessary to the final determination of the case."); *Salt Lake County v. Salt Lake City*, 570 P.2d 119, 121 n. 10 (Utah 1977) ("Where it is necessary to remand a case for further proceedings, it is the duty of the reviewing court to pass on matters which might become material."); *LeGrand Johnson Corp. v. Peterson*, 18 Utah 2d 260, 262–63, 420 P.2d 615, 617 (Utah 1966); *Joseph v. W.H. Groves Latter-day Saints Hosp.*, 7 Utah 2d 39, 45, 318 P.2d 330, 334 (Utah 1957).

¶ 31 The Pyramid Scheme Act provides that "A person may not organize, establish, promote, or administer any pyramid scheme." Utah Code Ann. § 76–6a–3(1) (2001). A "pyramid scheme" is defined as "any sales device or plan under which a person gives consideration to another person in exchange for compensation or the right to receive compensation which is derived primarily from the introduction of other persons into the sales device or plan rather than from

11. There is an exception to this reasoning: if the court had determined that the contract would be illegal under *either* interpretation of its meaning, summary judgment might then have been appropriate. Here, however, the evidence lends itself to two different interpretations, only one of which would be illegal under the trial court's reading of anti-pyramid scheme law.

12. Peterson claims that, even if the trial court correctly interpreted the Pyramid Scheme Act, the Act should not be applied to a contract that was executed prior to enactment of the statute. She claims that application of the statute is contrary to the longstanding rule that statutes do not apply retroactively unless the statute so indicates. *See* Utah Code Ann. § 68-3-3 (2002); *Cache*

*County v. Prop. Tax Div. of Utah State Tax Comm'n*, 922 P.2d 758, 767 (Utah 1996). Further, she contends that holding the agreement unenforceable impairs her contractual rights and is therefore a violation of Article I, Section 10 of the U.S. Constitution and Article I, Section 18 of the Utah Constitution. A review of the record reveals that Peterson raises these claims for the first time on appeal. "As a general rule, claims not raised before the trial court may not be raised on appeal." *State v. Holgate*, 2000 UT 74, ¶ 11, 10 P.3d 346; *Monson v. Carver*, 928 P.2d 1017, 1022 (Utah 1996). Furthermore, we need not reach these claims because we find that the trial court misinterpreted the language of the statute.

the sale of goods, services, or other property." *Id.* § 76–6a–2(4).

¶ 32 We conclude that the statute is not ambiguous. *Cf. State v. Hall*, 905 P.2d 899, 901 (Utah Ct.App.1995) (finding that the Act is not void for vagueness, but rather is "clear and unambiguous .... narrowly drawn to prohibit schemes ... where a person's compensation is derived primarily from bringing others into the plan"). The plain language of the Act identifies a particular problem: marketing plans in which commissions are paid based primarily upon recruitment rather than on sales of products. *See U.S. v. Gold Unlimited*, 177 F.3d 472, 483 (6th Cir. 1999) (identifying numerous state statutes, all of which define a pyramid scheme as a marketing program in which commissions are derived from recruiting). Such plans are widely considered to be against public policy inasmuch as they tend to reward only the top-level participants, encourage participants to buy more products than they need or can sell, and leave lower-level participants in a saturated market, unable to recoup their initial investment or achieve the economic success promised by promoters. *See, e.g., Webster v. Omnitrition Int'l, Inc.*, 79 F.3d 776, 781 (9th Cir.1996); *In re Amway*, 93 F.T.C. 618, 168, 170 (1979); *Utah Legislative Survey: 1983*, 1984 Utah L.Rev. 115, 208–17.

¶ 33 Defendants argue that because the contract enables Peterson to receive payments as though she "originally directly sponsored" the Farnsworth organization, the commissions are based primarily upon recruitment. Although defendants correctly identify sponsorship as recruitment, they fail to link Peterson's receipt of the Bonus to the actual "introduction of other persons into the sales device or plan." Defendants make no claim that Peterson made efforts to recruit the Farnsworths or others in the organization; nor do they assert that Peterson's payments over the 18–year period had any relationship to the number of people recruited into the organization. Without such evidence, the court had no cause to presume that the commissions contemplated by the agreement are "derived primarily" from recruitment.

¶ 34 The trial court's conclusion that the statute prohibits marketing plans in which commissions "are based only upon sponsorship of an organization, rather than promoting a product, selling a product, or training and supervising down-line distributors" is over broad. The fact that the right to a bonus originates from sponsorship does not necessarily mean that all subsequent commissions, no matter to whom they are paid or how they are calculated, are based primarily on recruitment. Peterson herself never gave consideration "in exchange for compensation or the right to receive compensation"; there is no reason to assume that because she did not engage in "promoting a product, selling a product, or training and supervising down-line distributors" her Bonus payments are based primarily upon recruitment. While it may be disconcerting that, under a contract such as this, a person could receive payments based solely upon sales made by others, this is not prohibited by the statute.[13]

¶ 35 Both the trial court in its ruling, and the defendants in their briefs on appeal, make reference to federal case law to support the conclusion that the contract is illegal. State and federal courts have applied a variety of legal theories to pyramid schemes, reviewing them as violations of lottery statutes, as illegal securities, as deceptive sales practices, as violations of antitrust law, or as illegal referral plans. *See* Erwin S. Barbre, Annotation, *Validity of Pyramid Distribution Plan*, 54 A.L.R.3d 217 (1973). Defendants do not rely on any of these theories. Rather, they rely upon the definition of pyramid scheme provided in a few federal cases discussing alternative theories. These cases, however, do nothing to expand the definition of "pyramid scheme" beyond that which is clearly provided in Utah's statute.

¶ 36 The Federal Trade Commission has set forth a two-part test for identifying an illegal pyramid scheme: ·

---

13. Contracts that allow a person to receive commissions based solely upon the work of others have been found to be investment contracts by some courts and held to be in violation of state and federal securities laws. *See, e.g., Webster*, 79 F.3d at 784. Neither defendants nor the trial court rely on such a theory here.

Such schemes are characterized by the payment by participants of money to the company in return for which they receive (1) the right to sell the product *and* (2) the right to receive in return for recruiting other participants into the program rewards which are unrelated to sale of the product to ultimate users.

*In re Amway,* 93 F.T.C. 618, 166–67 (1979) (quoting *Koscot Interplanetary, Inc.,* 86 F.T.C. 1106, 1180 (1975) (emphasis in original)). As defendants note, satisfaction of the second element of the test has been called the *"sine qua non* of a pyramid scheme." *Webster,* 79 F.3d at 781. Thus, under the federal rule, a court must consider whether a marketing plan offers the right to receive commissions "unrelated to the sale of the product" and in return for "recruiting other participants." As discussed above, defendants have not shown that the Bonus provided for in the contract at issue derives from recruitment or that it is unrelated to sales to consumers. Thus, at the summary judgment stage, federal law does nothing to bolster the claim that the contract is illegal.

¶ 37 We note that a marketing plan will not be immune from the application of anti-pyramid scheme law merely because it calculates commissions based on factors other than recruitment. Even where a marketing plan formally bases commissions on sales, the plan may still be found illegal if, in practice, profits come primarily from recruitment. *See Gold Unlimited,* 177 F.3d at 481–82 ("The government's evidence, focusing on the actual effect of the plan, deserves far more weight than . . . anti-saturation policies shown by the government already to have failed."); *Webster,* 79 F.3d at 783; *In re Amway,* 93 F.T.C. 618, 168 (stating that determining whether a plan is a pyramid scheme should be based upon "economic effect in these cases, rather than formalistic line drawing"). Thus, where a plan does not on its face base commissions on recruitment, there is a question of fact regarding whether compensation is in fact "derived primarily" from recruitment. *See Webster,* 79 F.3d at 784. In this case, the trial court made no

finding that under the contract the Bonus was derived from recruitment; it could not have done so without first construing the terms of the contract. The trial court therefore erred in holding as a matter of law that the contract was illegal under the Act and federal case law.

*C. Enforcement of an Illegal Contract*

¶ 38 After concluding that the contract serves a purpose prohibited by Utah's anti-pyramid scheme law, the court went on to hold that the contract was therefore illegal. Asserting that "the Court cannot enforce an illegal contract," the court dismissed Peterson's claims.

¶ 39 Despite the general rule that "every contract in violation of law is void," *Castleglen, Inc., v. Resolution Trust Corp.,* 984 F.2d 1571, 1582 (10th Cir.1993) (quoting *Baker v. Latses,* 60 Utah 38, 41, 206 P. 553, 555 (1922)), the fact that a contract serves a prohibited purpose does not necessarily make the contract unenforceable. *See McCormick v. Life Ins. Corp. of Am.,* 6 Utah 2d 170, 174, 308 P.2d 949, 951 (1957) ("[A]rbitrary refusal to grant relief under contracts merely in violation of statute often brings about such incongruous results in giving advantages to wrongdoers and penalizing the relatively innocent that the courts have carved out so many exceptions to the so-called 'general rule' that it can hardly be properly so denominated."); *see also* 6A Arthur Linton Corbin, *Corbin on Contracts* § 1373 (1962). After finding a contract illegal, the court must then determine whether a statute or public policy demands that the contract be held unenforceable. *McCormick,* 6 Utah 2d at 175, 308 P.2d at 952 ("[T]he courts look at the over-all picture of each such questioned contract and determine upon the facts of the individual case whether the ends of justice demand that relief be granted."); *see also Restatement (Second) of Contracts* § 178 (1981). Where, as here, the statute provides certain penalties and remedies, none of which are directly implicated by the facts of the case,[14] the court must inquire

---

14. The Act provides two remedies for breach of the statute. First, the act provides a criminal penalty for those who breach the statute "knowingly": "Any person who knowingly organizes,

whether the underlying purpose of the statute mandates holding the contract unenforceable, or whether the penalties and remedies provided in the statute are intended to be exclusive. *See Restatement (Second) of Contracts* § 179 cmt. b; 6A Arthur Linton Corbin, *Corbin on Contracts* § 1512 (1962). In addition, in considering the public policy regarding enforcement, the court must consider whether holding the contract unenforceable is to the benefit or detriment of the parties the statute is designed to protect. 6A Arthur Linton Corbin, *Corbin on Contracts* § 1513.

¶ 40 In this case, if the court finds that the contract falls within the statute, it need not consider the purpose and reach of the statute. A court may not by its ruling entreat a party to take criminal action. Thus, although a contract is not automatically unenforceable "merely [because it is] in violation of statute," *McCormick*, 6 Utah 2d at 174, 308 P.2d at 951, such a contract must be held unenforceable if enforcement would compel the party seeking to avoid the contract to violate a penal statute. Here, if the court were to find that the contract falls within the statute and yet nonetheless held that the contract is enforceable, Sunrider would be forced to "knowingly organize[ ], establish[ ], promote[ ], or administer[ ] a pyramid scheme" in violation of section 76–6a–4(1). Under the statute, defendants would then be liable for a third-degree felony. Utah Code Ann. § 76–6a–4(1) (2001).

¶ 41 The trial court must, therefore, hold the contract unenforceable if on remand it determines that the terms of the agreement place it within the prohibitions of the Act.

## CONCLUSION

¶ 42 We hold that the terms of the contract between Peterson and Sunrider are ambiguous and that there are genuine issues of fact as to the intent of the original contracting parties. The trial court erred in assuming the interpretation of the terms of the contract, and in concluding that the Pyramid Scheme Act required dismissal of Peterson's claims against Sunrider.

¶ 43 We therefore affirm the trial court's denial of Peterson's motion for partial summary judgment, and vacate the summary dismissal of Peterson's claim for breach of contract against Sunrider. The case is remanded to permit a factfinder to determine the meaning of the contract, whether the contract falls within the Act, and, if it does not, whether Sunrider breached the contract by refusing to make override payments to Peterson.

¶ 44 Justice HOWE, Associate Chief Justice DURRANT, and Justice WILKINS concur in Chief Justice DURHAM's opinion.

¶ 45 Justice RUSSON concurs in the result.

establishes, promotes, or administers a pyramid scheme is guilty of a third degree felony." Utah Code Ann. § 76–6a–4(1) (2001). Second, the Act allows a person who has given consideration in exchange for pyramid scheme rights to void the contract and seek reimbursement:

Any person giving consideration in connection with a pyramid scheme may, notwithstanding any agreement to the contrary, declare his giving of consideration and the related sale or contract for sale void, and may bring a court action to recover the consideration. In the action, the court shall, in addition to any judgment awarded to the plaintiff, require the defendant to pay to the plaintiff interest as provided in Section 15–1–4, reasonable attorneys' fees, and the costs of the action reduced by any compensation paid by the defendant to the plaintiff in connection with the pyramid scheme. *Id.* § 76–6a–6(1).