**WHOLE LIVING, INC., a Nevada Corp. dba the Brain Garden, Plaintiffs,**

v.

**Don TOLMAN, Mark Bowen, Think Again, Inc., a Tennessee corporation, dba Great American, the Wholefood Farmacy, et al., Defendants.**

No. 2:03–CV–272–TS.

United States District Court, D. Utah, Central Division.

Nov. 9, 2004.

Margaret H. Olson, Hobbs & Olson, Salt Lake City, UT, Daniel W Jackson, Salt Lake City, UT, for Whole Living.

Michael Blue, D. Zachary Wiseman, Salt Lake City, UT, Thayer C. Lindauer, Cambria, CA, for Don Tolman.

Thayer C. Lindauer, Cambria, CA, for Mark Bowen, Think Again, Wholefood Farmacy.

## MEMORANDUM AND ORDER DENYING DEFENDANTS' AMENDED MOTION TO QUASH PRELIMINARY INJUNCTION AND PRIOR TRO ORDER NUNC PRO TUNC TO DATES OF ORIGINATION

STEWART, District Judge.

This matter is before the court for consideration of Defendants' Amended Motion

to Quash Preliminary Injunction and Prior TRO *Nunc Pro Tunc* to Dates of Origination.

## I. INTRODUCTION

Since April 2, 2003, Defendants have been enjoined from using Plaintiffs' formulas promotional and sales materials and, pursuant to a non-compete clause in a consulting contract, Defendant Don Tolman has been enjoined from competition with Plaintiffs pending trial. Defendants seek to quash, *nunc pro tunc* to the date of their issuance, the April 2, 2003, TRO and the August 4, 2003, Preliminary Injunction that replaced the TRO on the grounds that Plaintiffs' business operates as an illegal pyramid scheme, sales of unregistered investment securities, or an illegal lottery.

The court finds that Defendants have not shown that Plaintiffs' business operates as an illegal pyramid scheme, lottery, or as an unregistered security. The court further finds that Defendants have not shown that, even if the Plaintiffs' distributor contracts serve an illegal purpose, that the contracts at issue in this case should not be enforced. Accordingly, the court will not quash the injunctions.

## II. UNDISPUTED FACTS

For the purpose of this motion, the facts the parties presented by affidavits are not disputed. The following facts are from the Affidavit of Douglas Burdick, Whole Living's President. Plaintiff Whole Living is a publicly traded corporation which owns all of the issued and outstanding stock of Plaintiff Brain Garden, its wholly owned subsidiary. Whole Living is a holding company which conducts no ongoing business.

Brain Garden manufactures and sells food products, cosmetic products, and essential oils by means of a multi-level marketing organization. Brain Garden re-quires distributors to purchase a sales kit for $39.95 to qualify as a distributor. Distributors use the contents of the sales kit in the operation of their individual businesses.

Brain Garden distributors qualify for the right to receive commissions by means of what is called "personal volume." The entry level distributor must have a monthly personal volume (PV) of 100. To reach higher levels, the qualifying distributor must have a monthly PV of 200.

A distributor's PV is comprised of any wholesale purchases he or she makes from the company and/or all sales made to retail customers by that distributor. Purchases made by another distributor do not comprise any part of a distributor's PV. All of a qualifying distributor's PV can be based on retail sales to customers.

Under Brain Garden's program, every distributor purchases product directly from the company at the wholesale price paid by every other distributor. In all but a few cases, such as when a distributor desires to sell products at a trade show or similar event, the purchases made by retail customers are processed and shipped to those customers by the company. A Brain Garden distributor cannot advance to any higher level through his or her purchase of large amounts of the company's products. No amount of personal buying will enhance a distributor's own commission under Brain Garden's program. Brain Garden distributors make a profit when they sell the company's products to customers (not distributors).

In January 2004, sales made to retail customers outnumbered purchases by Brain Garden's distributors by seven to one. A qualified distributor will receive a $50.00 commission on any sale of Brain Garden's Food First Package.

Ten percent of all sales by Brain Garden are placed in a monthly "pool." Funds in this pool are distributed monthly to qualified distributors who enroll five customers or distributors who have a qualifying personal volume of 100 or more. For each five enrollees, the qualified distributor receives one share in the pool.

Brain Garden has a "70% rule." Under this rule, on the rare occasion that a distributor purchases more product than he and his immediate family could consume in a given month, that distributor is required to certify that 70% of that inventory was sold to retail customers before ordering new product.

As of March 9, 2004, Brain Garden had 487 active distributors receiving commissions. Two hundred and seventy of those distributors, or more than half, qualified for their January 2004 commissions without any personal purchase of product. Another 167 distributors qualified for the higher commission levels through purchasing only one half of the required PV. Only 45, or less than ten percent, of Brain Garden's qualified distributors personally purchased more than $200 of product in January 2004.

The following facts are from the affidavit of Defendant Don Tolman:

Under Brain Garden's program, a distributor may sponsor other distributors and thereby build a linked-by-sponsorship "downline" sales organization of distributors. Commissions are paid on the purchases made by other distributors in their linked-by-sponsorship downline distributor sales organization.

The Brain Garden Policies and Procedures provide:

Product Return Policy. Due to the PERISHABLE nature of Brain Garden, Inc.'s products, product returns for a refund are UNABLE to be accepted.[1]

\*   \*   \*   \*   \*   \*

A newly sponsored distributor who makes a purchase of $25 or more has three business days (72 hours) after the sale or execution of a contract to cancel their FIRST small order and be entitled to a full refund.

\*   \*   \*   \*   \*   \*

Ordering. Mail-in orders will need to be received by the last day of the calendar month to be accepted for the previous volume month's qualifications. Distributors must use or sell at least 70% of the products they order before making another purchase.

Def.s' Ex. B, at 7–8 and 17.

During the period from March 1, 2002, through January 2, 2004, Plaintiffs have solicited distributors to its multi-level sales program and purchases from Plaintiffs by means of Internet offerings, e-mail, and mail solicitations and have had multi-level distributors in all or most of the states of the United States.

## III. DISCUSSION

Defendants move to vacate the injunction orders on the grounds that Plaintiffs' multi-level marketing plans are an illegal pyramid scheme, sales of unregistered investment securities or an illegal lottery. Defendants contend that the injunction should be quashed, *nunc pro tunc* to their date of issue, because it is "per se against public policy to protect illegal sales operations from competition by Court injunction." Def.s' Reply at 11.

### A. Pyramid Scheme

In determining when a multi-level marketing plan is an illegal pyramid scheme,

---

1. The policy does allow return of defective products. Ex. B at 7.

federal and Utah state law apply similar standards. The federal standards are summarized in the *Omnitrition* case from the Ninth Circuit. *Webster v. Omnitrition Int'l, Inc.*, 79 F.3d 776, 781–783 (9th Cir. 1996). In *Omnitrition*, the distributors of a company's products who had lost money brought suit against the company and its principals alleging the existence of an illegal pyramid scheme. *Id.* at 780–81. The Ninth Circuit considered what constitutes an inherently fraudulent pyramid scheme for purposes of several federal antifraud statutes.

> Pyramid schemes are said to be inherently fraudulent because they must eventually collapse.... The Federal Trade Commission has established a test for determining what constitutes a pyramid scheme. Such contrivances
>
> > are characterized by the payment by participants of money to the company in return for which they receive (1) the right to sell a product *and* (2) the right to receive in return for recruiting other participants into the program rewards which are unrelated to sale of the product to ultimate users.
>
> *[In re Koscot Interplanetary, Inc.]*, 86 F.T.C. 1106, 1181 (1975), *aff'd mem. sub nom., Turner v. F.T.C.*, 580 F.2d 701 (D.C.Cir.1978) ... (emphasis in original). The satisfaction of the second element of the *Koscot* test is the *sine qua non* of a pyramid scheme: "As is apparent, the presence of this second element, recruitment with rewards unrelated to product sales, is nothing more than an elaborate chain letter device in which individuals who pay a valuable consideration with the expectation of recouping it to some degree via recruitment are bound to be disappointed." *Id.* We adopt the *Koscot* standard here and hold that the operation of a pyramid scheme constitutes fraud for purposes of several federal antifraud statutes.

Omnitrition argues that because it does not charge for the right to sell its products at the "distributor" level, as a matter of law the first *Koscot* element is not met. We disagree.

Omnitrition's argument improperly focuses only on the "distributor" level of Omnitrition's program. The program is unquestionably *not* a pyramid scheme if only the distributor level is taken into account; the participant pays no money to Omnitrition, has the right to sell products and has no right to receive compensation for recruiting others into the program. The distributor level, however, is only a small part of the entire program. Taking into account the "supervisor" levels, a reasonable jury could conclude the *Koscot* factors are met here.

To become a supervisor, a participant must pay a substantial amount of money to Omnitrition in the form of *large* monthly product orders. The "payment of money" element of a pyramid scheme *can* be met where the participant is required to purchase "non returnable" inventory in order to receive the full benefits of the program. *In re Amway Corp.*, 93 F.T.C. 618, 715–16 (1979). In exchange for these purchases, the supervisor receives the right to sell the products and earn compensation based on product orders made by the supervisor's recruits. This compensation is facially "unrelated to the sale of the product to ultimate users" because it is paid based on the suggested retail price of the amount *ordered* from Omnitrition, rather than based on *actual sales* to consumers.

On its face, Omnitrition's program appears to be a pyramid scheme. Omnitrition cannot save itself simply by pointing to the fact that it makes some retail

sales. *See In re Ger–Ro–Mar, Inc.,* 84 F.T.C. 95, 148–49 (1974) (that some retail sales occur does not mitigate the unlawful nature of pyramid schemes), *rev'd on other grounds,* 518 F.2d 33 (2d Cir.1975). The promise of lucrative rewards for recruiting others tends to induce participants to focus on the recruitment side of the business at the expense of their retail marketing efforts, making it unlikely that meaningful opportunities for retail sales will occur. *Koscot,* 86 F.T.C. at 1181. The danger of such "recruitment focus" is present in Omnitrition's program. For example, Webster testified that Omnitrition encouraged him to "get to supervisor as quick as [he] could." Ligon states:

> [T]he product sales are driven by enrolling people. In other words, the people buy *exorbitant amounts* of products that normally would not be sold in an average market by virtue of the fact that they enroll, get caught up in the process, in the enthusiasm, . . . by buying exorbitant amounts of products, giving products away and get[ting] involved in their proven plan of success, their marketing plan. It has nothing to do with the normal supply and demand in this world. It has to do with getting people enrolled, enrolling people, getting them on the bandwagon and getting them to sell product.

Omnitrition argues that Webster failed to submit sufficient admissible proof that Omnitrition is a pyramid scheme. We disagree. The mere structure of the scheme suggests that Omnitrition's focus was in promoting *the program* rather than selling *the products.* When added to statements from Webster's and Ligon's depositions, plaintiffs have pro-

duced sufficient evidence to defeat summary judgment.

To rebut the pyramid allegations, Omnitrition relies heavily on *In re Amway Corp.,* 93 F.T.C. 618 (1979), in which the FTC found Amway was not a pyramid scheme because its policies prevented inventory loading and encouraged retail sales. *Id.* at 715–16.

*Omnitrition Int'l.,* 79 F.3d at 781–782 (underlined emphasis added).

■ In *Amway,* the FTC examined the Amway Plan and determined that it was not an inherently deceptive illegal pyramid scheme. *In re Amway Corp.,* 93 F.T.C. 618, 1979 WL 198944 (1979) (final admin. review). As noted in *Amway,* multi-level marketing schemes previously found to be illegal operated by "requir[ing] a person seeking to become a distributor to pay a large sum of money, either as an entry fee . . . or for the purchase of a large amount of nonrefundable inventory (a practice known as 'inventory loading')." *Id.* at 8 (Opinion of the Commission). "'Inventory loading' occurs when distributors make the minimum required purchases to receive recruitment-based bonuses without reselling the products to consumers." *Omnitrition,* 79 F.3d at 783 n. 3. The ALJ's Initial Decision in *Amway* explains that, at that time,[2] the typical pyramid company that relied on "inventory loading" "require[d] new recruits to buy $2000 to $5000 in inventory, with as much as half of that amount going to the recruiting distributor." 93 F.T.C. 618, at 65 (Initial Decision).

Utah's Pyramid Scheme Act provides: "A person may not organize, establish, promote, or administer any pyramid scheme." Utah Code Ann. § 76–6a–3(1) (2001). A "pyramid scheme" is defined as "any sales device or plan under which

---

**2.** The ALJ's Initial Decision was June 23, 1978.

a person gives consideration to another person in exchange for compensation or the right to receive compensation which is derived primarily from the introduction of other persons into the sales device or plan rather than from the sale of goods, services, or other property." *Id.* § 76–6a–2(4).

*Peterson v. Sunrider Corp.,* 48 P.3d 918, 928–929 (Utah 2002).

■ Whether a multi-level marketing plan operates as illegal pyramid scheme is determined by how it functions in practice. *Peterson,* 48 P.3d at 930 (citing *Gold Unlimited,* 177 F.3d at 481–82); *Omnitrition,* 79 F.3d at 783; *Amway,* 93 F.T.C. at 8–10 (Opinion of the Commission). In making such a determination, many parties look to the so-called *Amway* defense. 93 F.T.C. at 8–9 (Opinion of the Commission). In *Amway,* the FTC affirmed an ALJ's finding that the record did not support the charge that it was an illegal pyramid scheme. The FTC found that Amway's Plan was distinguished from other illegal plans because a person seeking to become a distributor was not required to pay a large amount of money or purchase a large amount of non-refundable inventory. *Id.* Instead, in *Amway's* program, like Brain Garden's program, a sponsor received nothing for the mere act of sponsoring but starting distributors were required to purchase an inexpensive starter kit. *Id. Amway's* starter kit was $15.46 and that amount was refundable if a distributor left. *Id.*

Additionally, the FTC determined that Amway's enforcement of three of its internal rules prevented the type of "inventory loading" that characterized illegal pyramid schemes in other FTC cases. Those three rules were (1) a buy-back rule under which Amway, or one of its sponsoring distributors was required, upon request of the downline distributor, to buy back unsold product; (2) a 70 percent rule and (3) a 10 customer rule. The FTC agreed with the ALJ's finding that these rules served to prevent inventory loading and encourage retailing. *Id.*

■ The fact that there are some retail sales does not mitigate the unlawful nature of a pyramid scheme. *Omnitrition,* 79 F.3d at 782–83. However, the fact that the right to receive a commission originates from sponsorship does not necessarily mean that all subsequent commissions are based primarily on recruitment. *Peterson,* 48 P.3d at 929.

■ Defendants contend that Brain Garden operates two compensation plans: (1) distributors qualify for commissions on the sales of products by their sponsored or downline distributors through minimum monthly sales to retail customers of $100 or $200 and (2) distributors qualify for such commission based upon their own purchases in the amount of the same qualifying minimums. Defendants allege that Brain Garden's multi-level marketing plan operates as an illegal pyramid scheme because:

> The key and illegal feature in both plans is that the commission earning Distributor receives commissions on the purchases of Distributors in their defined downline, not just on the customer sales volume attained by Distributors in their defined downline.

Def.s' Reply at 3.

However, Defendants misread the relevant case law. A structure that allows commissions on downline purchases by other distributors does not, by itself, render a multi-level marketing scheme an illegal pyramid. If it did, the Amway Plan would have been an illegal pyramid scheme because its distributors received commissions on purchases by their downline distributors. This was true even

when, as in Brain Garden, such purchases by downline distributors were for that distributor's own use. *See Amway*, 93 F.T.C. at 20 n. 24 (Opinion of the Commission)(noting that ALJ found that "the home consumption of Amway products by distributors account[ed] for a significant amount of Amway's sales"); *see Id.* at 115 (Initial Decision)(finding that many Amway distributors are distributors in order to buy the products for their own consumption at the 30% distributor discount rate).

Amway's plan is also similar to Brain Garden's in that it required a qualifying sales volume in order to become a "Direct Distributor" who then receives a commission on the sales of his or her downline distributors. *Id.* at 12 (Initial Decision) In *Amway*, the sales volume necessary to reach status as a "Direct Distributor" and thereby obtain commissions on the purchases by downline distributors and retail customers was, in 1979, $8,500 a month. *Id.* The qualifying sales volume for Amway Direct Distributors included sales made by the Direct Distributors to their downline distributors. As noted above, in Brain Garden's plan the sales volume necessary to qualify to receive commissions on downline sales is either $100 or, for a higher commission, $200.

The Brain Garden plan does differ from the Amway plan in several respects. First, that all purchases are non-refundable. Second, each distributor purchases products directly from the company at the same price. Third, customers purchase directly from the company. Thus, under the structure of the Brain Garden plan, unlike the structures of other multi-level plans found to be illegal pyramid schemes, there is no incentive for a distributor to personally buy large amounts of the product to push it on a downline distributor. Fourth, beyond the relatively small [3] qualifying amount of $100 to $200 a month, no larger amount of purchases will increase a distributor's commission rate, therefore there is no incentive for a distributor to purchase large amounts of non-refundable product to obtain large commissions. Thus, because there no incentive for inventory loading, there is no showing that rules, such as a full refund policy, are needed to discourage inventory loading.

However, Brain Garden does have at least one of the same rules as the Amway plan—the 70% rule. There is no evidence in this case that the 70% rule is not effective or enforced.

Finally, although Defendants contend that this is an inventory loading case, they do not show that in operation, the Brain Garden plan encourages or results in inventory loading by means of large purchases of non-refundable inventory. *C.f. Ger-Ro-Mar, Inc. v. F.T.C.*, 518 F.2d 33, 37–38 (2nd Cir.1975)(holding that while FTC need not establish actual deception by the testimony of entrepreneur, where there was no showing of likely deception, there was no showing that marketing scheme was inherently unfair or deceptive).

---

**3.** These amounts are small compared to the large amounts of product purchases required in plans where there is a danger of inventory loading, such as the typical $2,000 to $5,000 noted by the Amway ALJ and the "several thousand of dollars worth of product *each* month" that a distributor must have purchased in Omnitrition to qualify to obtain commissions on sales by downline distributors. 79 F.3d at 780 (emphasis added); *see also Monroe Bounds v. Figurettes, Inc.*, 135 Cal.App.3d 1, at 8–9, 185 Cal.Rptr. 480 (Cal. App.1982) (describing increasing percentages of commissions on downline distributor sales as based on the supervisor's purchases of inventory in *monthly* amounts of $5,000 and $10,000).

Similarly, Defendants have not shown that Brain Garden operates an illegal pyramid scheme under Utah's Pyramid Scheme Act because they have not shown that the right to receive compensation under Brain Garden's plan is "derived primarily from the introduction of other persons into the sales device or plan rather than from the sale of goods, services, or other property." Utah Code Ann. § 76–6a–2(4).

### B. Investment Contracts/Unregistered Securities

Defendants contend that the Brain Garden plan is an investment contract because: (1) it is an illegal pyramid and (2) the price of the sales kit plus the monthly amount necessary to obtain a commission on downline sales is a common enterprise where the managerial efforts are those of the company and those in the downline organization of the distributors.

Plaintiffs contend that its plan is not an investment scheme because it is not an investment where the distributors' purchase of the sales kit and the qualifying PV are motivated by desire to use or consume the item purchased.

> The test for whether a particular scheme is an investment contract was established in our decision in *SEC v. W.J. Howey Co.*, 328 U.S. 293, 66 S.Ct. 1100, 90 L.Ed. 1244 (1946). We look to "whether the scheme involves an investment of money in a ... common enterprise with profits to come solely from the efforts of others." *Id.*, at 301, 66 S.Ct. 1100. This definition "embodies a flexible rather than a static principle, one that is capable of adaptation to meet the countless and variable schemes devised by those who seek the use of the money of others on the promise of profits." *Id.*, at 299, 66 S.Ct. 1100 ...
>
> \*  \*  \*  \*  \*  \*

> Thus, when we held that "profits" must "come solely from the efforts of others," we were speaking of the profits that investors seek on their investment, not the profits of the scheme in which they invest. We used "profits" in the sense of income or return, to include, for example, dividends, other periodic payments, or the increased value of the investment.
>
> In *United Housing Foundation, Inc. v. Forman*, 421 U.S. 837, 95 S.Ct. 2051, 44 L.Ed.2d 621 (1975), we considered whether "shares" in a nonprofit housing cooperative were investment contracts under the securities laws. We identified the "touchstone" of an investment contract as "the presence of an investment in a common venture premised on a reasonable expectation of profits to be derived from the entrepreneurial or managerial efforts of others," and then laid out two examples of investor interests that we had previously found to be "profits." *Id.*, at 852, 95 S.Ct. 2051. Those were "capital appreciation resulting from the development of the initial investment" and "participation in earnings resulting from the use of investors' funds." *Ibid.* We contrasted those examples, in which "the investor is 'attracted solely by the prospects of a return'" on the investment, with housing cooperative shares, regarding which the purchaser "is motivated by a desire to use or consume the item purchased." *Id.*, at 852–853, 95 S.Ct. 2051.

*S.E.C. v. Edwards*, 540 U.S. 389, 124 S.Ct. 892, 896–898, 157 L.Ed.2d 813 (2004).

■ The court finds that Defendants have not shown that the Brain Garden plan is an investment. As discussed above, it has not been shown to be an illegal pyramid scheme. There is no evidence that the distributors expected to

obtain profits on an "investment," which under *Edwards,* and the cases cited therein, would mean a return on the purchase of the sale kit and monthly PV. They do expect to receive profits on their own sales and commissions on the downline sales, which are the profits of the "scheme" itself, not profits on the "investment." The case cited by Defendants is inapposite because that case construed the specific language of a North Dakota statute, not applicable to the present case. *See Meadow Fresh Farms, Inc. v. Sandstrom,* 333 N.W.2d 780, 783–84 (N.D.1983) 783 (quoting N.D.C.C. § 10–04–02(12) as defining security as "any ... arrangement in which persons invest in a common enterprise the returns of which depend *to any extent* upon inducing other person *to participate or* invest in the enterprise") (underlined emphasis added).

Further, the court agrees with Plaintiffs that even where the sales kit and monthly PV are consumed by the distributor instead of used for retail sales, the amounts are not an investment because, in such instances, the purchase "is motivated by a desire to use or consume the item purchased." *Edwards,* 124 S.Ct. at 898.

### C. Lottery

Defendants contend that the Brain Garden plan is a lottery under a Postal Service Decision finding that an illegal pyramid scheme was also an illegal lottery. In support, it attaches an undated and unpublished decision from the Postal Service's Chief Administrative Law Judge, that Defendants represent to be the *Unimax* case. See Def.s' Ex. I.

The court need not determine if such an unpublished administrative law case would be persuasive because Defendants have not shown its relevance to the present case, for example, by presenting evidence on the issue of control as the Postal Ser-

vice did by expert evidence in the unpublished case. See Def.s' Ex. I. There is simply no evidence that the Brain Garden plan is a lottery.

### D. Enforcement of an Illegal Contract

In the alternative, the court finds that even if Defendants had shown that the Brain Garden distribution plans operate as an illegal pyramid scheme, sales of unregistered investment securities, or an illegal lottery, they have not shown that the contracts at issue in this case should not be enforced. This issue was discussed in *Peterson:*

> Despite the general rule that "every contract in violation of law is void," *Castleglen, Inc., v. Resolution Trust Corp.,* 984 F.2d 1571, 1582 (10th Cir.1993), the fact that a contract serves a prohibited purpose does not necessarily make the contract unenforceable. *See McCormick v. Life Ins. Corp. of Am.,* 6 Utah 2d 170, 308 P.2d 949, 951 (1957) ("[A]rbitrary refusal to grant relief under contracts merely in violation of statute often brings about such incongruous results in giving advantages to wrongdoers and penalizing the relatively innocent that the courts have carved out so many exceptions to the so-called 'general rule' that it can hardly be properly so denominated."); *see also* 6A Arthur Linton Corbin, *Corbin on Contracts* § 1373 (1962). After finding a contract illegal, the court must then determine whether a statute or public policy demands that the contract be held unenforceable. *McCormick,* 308 P.2d at 952 ("[T]he courts look at the over-all picture of each such questioned contract and determine upon the facts of the individual case whether the ends of justice demand that relief be granted."); *see also Restatement (Second) of Contracts* § 178 (1981). Where, as here, the statute pro-

vides certain penalties and remedies, none of which are directly implicated by the facts of the case, the court must inquire whether the underlying purpose of the statute mandates holding the contract unenforceable, or whether the penalties and remedies provided in the statute are intended to be exclusive. *See Restatement (Second) of Contracts* § 179 cmt. b; 6A Arthur Linton Corbin, *Corbin on Contracts* § 1512 (1962). In addition, in considering the public policy regarding enforcement, the court must consider whether holding the contract unenforceable is to the benefit or detriment of the parties the statute is designed to protect. 6A Arthur Linton Corbin, *Corbin on Contracts* § 1513.

In this case, if the court finds that the contract falls within the statute, it need not consider the purpose and reach of the statute. A court may not by its ruling entreat a party to take criminal action. Thus, although a contract is not automatically unenforceable "merely [because it is] in violation of statute," *McCormick,* 6 Utah 2d at 174, 308 P.2d at 951, such a contract must be held unenforceable *if enforcement would compel the party seeking to avoid the contract to violate a penal statute.* Here, if the court were to find that the contract falls within the statute and yet nonetheless held that the contract is enforceable, Sunrider would be forced to "knowingly organize, establish, promote, or administer a pyramid scheme" in violation of section 76–6a–4(1). Under the statute, defendants would then be liable for a third-degree felony. Utah Code Ann. § 76–6a–4(1) (2001).

The trial court must, therefore, hold the contract unenforceable if on remand it determines that the terms of the agreement place it within the prohibitions of the Act.

*Peterson,* 48 P.3d at 930–31 (underlined emphasis added).

The contracts at issue in the present case are comprised of a November 30, 1998, Consulting Agreement, an April 11, 2002, Second Consulting Agreement containing a two-year non-compete clause, and a Master Distributorship provided for by the November 30, 1998, Consulting Agreement then allegedly sold to a third party as part of the settlement of an unrelated dispute. Plaintiffs seek to enforce the April 11, 2002, contract's covenant not to compete and Defendant Don Tolman seeks, by a counterclaim, to enforce rights under the Master Distributorship, and royalties on sales, and educational and training aides he claims are due under the November 30, 1998, and the April 11, 2002, Consulting Agreements. Other contracts, such as the contracts for the sale of intellectual property that are the subject of the claim for misappropriation of trade secrets claim were not at issue in the August 4, 2003, Preliminary Injunction Order because Defendants stipulated that a permanent injunction could be entered on those matters. Order at 6, 8, and 11.

■ Defendants have not shown that the contracts at issue should not be enforced as void for violation of either federal law regarding illegal pyramid schemes or securities. They have neither shown in what way these contracts (as opposed to the Distributorship contracts[4]) violate Utah's Pyramid Scheme Act. If the contracts at issue did fall within Utah Pyramid Scheme Act, the court would then look to see if the remedies provided under that

---

**4.** The record is not clear on whether the Master Distributorship at issue was created by separate contract.

Act were intended to be exclusive. Finally, the court would have to look to determine if enforcement of the contracts would "compel the party seeking to avoid the contract to violate a penal statute." *Peterson*, 48 P.3d at 931.

In the present case, Defendants are seeking to *enforce* rights under the contracts as well as to void the contracts. *See* Defendants Answer to Second Amended Complaint and Counterclaims of Don Tolman (filed on May 5, 2003) at 7–12 and Defendants' Answer to Third Amended Complaint and Counterclaims of Don Tolman, at 2–10 (filed on October 13, 2004). The Defendants, as movants, have the burden on this Motion. Defendants have not shown how the enforcement of the covenant not to compete would compel Defendants, as the parties seeking to void the Consulting Contracts, to violate a penal statute.

Accordingly, the court finds that even if Defendants had shown that the Brain Garden distribution plan were illegal under federal or state law, Defendants have not shown that they are entitled to have the separate contracts at issue in this case not enforced on the grounds of illegality.

## IV. CONCLUSION AND ORDER

In conclusion, the court notes that Defendants have failed to state any grounds for failing to timely bring their arguments of illegality as a defense to the injunction motion. Accordingly, they state no grounds for *nunc pro tunc* relief. For the foregoing reasons, it is therefore

ORDERED that Defendants' Amended Motion to Quash Preliminary Injunction and Prior TRO *Nunc Pro Tunc* to Dates of Origination are DENIED.