*This opinion is subject to revision before final publication in the Pacific Reporter*

**2014 UT 32**

IN THE

## SUPREME COURT OF THE STATE OF UTAH

BETTY KEITH,
*Appellant and Plaintiff,*

*v.*

MOUNTAIN RESORTS DEVELOPMENT, L.L.C.,
a Delaware limited liability company, et al.
*Appellee and Defendant.*

No. 20120792
Filed August 8, 2014

Fourth District, Heber Dep't
The Honorable Derek P. Pullan
No. 080500502

Attorneys:

Denise A. Dragoo, Elisabeth M. McOmber, Robert E. Mansfield,
Salt Lake City, for appellant

John A. Snow, Nicole M. Deforge, Kelley M. Marsden,
Salt Lake City, for appellee

ASSOCIATE CHIEF JUSTICE NEHRING authored the opinion of
the Court, in which CHIEF JUSTICE DURRANT, JUSTICE DURHAM,
JUSTICE PARRISH, and JUSTICE LEE joined.

ASSOCIATE CHIEF JUSTICE NEHRING, opinion of the Court:

### INTRODUCTION

¶ 1    This case is about land in Park City, Utah—a little town that has undergone many transformations. Mormon pioneers first traveled through the area on their way to Salt Lake City. When prospectors discovered silver in the hills, it became a mining boomtown, then, when the price of silver fell, it was nearly deserted as a ghost town—but industrious residents reinvented it as a luxury resort destination, which it remains today. At the heart of this appeal is a dispute about land once owned by one of

the original Park City mining magnates—appellant's great-grandfather, Mr. David Keith—who along with Mr. Thomas Kearns founded the highly successful Silver King Mining Company in Park City in the 1890s. The property that gave rise to this dispute is located near what is now the luxury ski resort Deer Valley. Appellant, Ms. Betty Keith, and her two siblings, Ms. Geneva Keith Ulm and Mr. David Keith IV, inherited the parcels of land at issue from their father, Mr. David Keith III. Following the bequest, the siblings owned the relevant parcels as tenants in common with each other and with United Park City Mines (UPCM).

¶ 2 After Ms. Keith inherited the property in 1996, she and UPCM decided to jointly develop the parcels. In 2002, the parties submitted a development plan to the county, which was approved. UPCM was later acquired by Talisker Corporation, Mountain Resort Developments' (MRD) parent company. Unfortunately, MRD and Ms. Keith could not agree how to jointly develop the property, nor could they agree on a purchase price for Ms. Keith's interest in the parcels. In 2005, after several years of unsuccessful negotiation, MRD filed an action to partition the property. The parties ultimately entered a settlement agreement (2005 settlement agreement) and exchanged interests in the parcels. Ms. Keith gained an undivided interest in parcel A and MRD received an undivided interest in parcels B and C. Thereafter, MRD asserted that Ms. Keith had retained no development rights under the development plan. Ms. Keith sued for breach of contract, fraudulent inducement, and tortious interference with prospective economic relations, among other claims. The district court granted summary judgment to MRD and dismissed all of Ms. Keith's claims. We affirm.

## BACKGROUND

¶ 3 In early 2002, Ms. Keith and UPCM agreed that UPCM would submit an application to Wasatch County for approval of a large real estate development—"Pioche Mountain Estates"—on the common property (development plan). The proposed development covered 321 acres; contained 183 "equivalent residential units" (ERUs)[1] including condominiums, ski lodges,

---

[1] An ERU is the Wasatch County equivalent of a development right that assigns density to the development. Development

and residential lots; and spanned the entirety of the three parcels commonly owned by Ms. Keith and UPCM (later MRD). Wasatch County approved the preliminary development plan (2002 approval).

¶ 4    Ms. Keith and MRD began to disagree about the development. They could not agree how to proceed together nor on a purchase price for Ms. Keith's interests in the three parcels. They continued to negotiate and exchanged various offers in an attempt to reach an agreement.

¶ 5    On April 30, 2004, MRD made an offer to exchange interests in the parcels with Ms. Keith and share in development costs "based upon our proportionate densities" (2004 settlement offer). Under the terms of this offer, Ms. Keith would have continued as part of the development and would have shared in the development costs based upon the number of ERUs in proportion to her property interest. Ms. Keith rejected the offer.

¶ 6    In 2004, MRD purchased Ms. Keith's siblings' interests in the parcels.[2] At that point, MRD owned all of parcels A, B, and C, except for Ms. Keith's interests. Ms. Keith's interests comprised one-third of parcel A, 8.3 percent of parcel B, and 11.12 percent of parcel C. Parcel A consisted of approximately forty acres. Parcels B and C together covered approximately 280 acres.

---

rights in Wasatch County's "Mountain Zone" are assigned based in part upon the open space available to support such density. WASATCH CNTY., UTAH, CODE §§ 16.29.08, -14 (Sterling 2013); *available at* http://www.sterlingcodifiers.com /codebook/index.php?book_id=940. Because the relevant provisions of the Wasatch County Code are substantively identical, as a convenience to the reader we cite throughout this opinion to the current version of the code.

[2] The special warranty deed granted by Ms. Keith's siblings to MRD specified that the land was transferred, together with "all right, title and interest of the Grantor in and to all improvements located on the Property, all appurtenances, easements, rights-of-way and all other rights and privileges appertaining to the Property, [and] *all development entitlements, approvals and permits pertaining to the Property*." (emphasis added).

¶ 7   In January 2005, MRD sought legal partition of its ownership interest from Ms. Keith's ownership interest in parcels A, B, and C, while continuing to engage in settlement negotiations with Ms. Keith.  On April 28, 2005, Ms. Keith submitted an offer to settle the partition action (2005 settlement offer).  She made two offers:

> First . . . [Ms. Keith] is willing to make an offer of $5,100,000 for [MRD's] interest in the parcels. In the alternative, she would trade her interest in all other parcels if [MRD] would convey to her a hundred percent interest in Parcel A.

¶ 8   MRD accepted the second offer on the terms stated by Ms. Keith.  Ms. Keith and MRD exchanged special warranty deeds whereby MRD conveyed all of its interest in parcel A and Ms. Keith conveyed to MRD all of her interest in parcels B and C. The parties then stipulated to the dismissal of the partition action.

¶ 9   The special warranty deeds exchanged by the parties contained mirror language expressing the intent to mutually exchange 100 percent interest in the respective parcels,

> Together with all the appurtenances, rights and privileges thereunto belonging; and Subject to restrictions, reservations, covenants, conditions, easements and right-of-ways now of record, all other matters now of record, and general property taxes, assessments and charges for the year 2005 and thereafter.[3]

¶ 10 Following the settlement, Ms. Keith discovered that MRD no longer considered her a part of the Pioche development plan and instead intended to pursue the development plan without her and without parcel A, which Ms. Keith now owned in its entirety.  The parties do not dispute that MRD informed county officials and potential buyers of Ms. Keith's property that

---

[3] The deed Ms. Keith granted to MRD and the mirror deed MRD granted her are different from the deeds Ms. Keith's siblings granted to MRD.  Specifically, Ms. Keith's deed omits the language purporting to grant "all development entitlements, approvals and permits pertaining to the Property."

MRD had retained all 183 ERUs approved in the 2002 approval of the Pioche development and that it believed that no ERUs were transferred to Ms. Keith in the settlement agreement.[4]

¶ 11 After the exchange of deeds under the 2005 settlement agreement, Ms. Keith continued to pay Wasatch County for forty-eight ERUs as they related to the water rights of the property. Additionally, a comparison of the map of parcel A with the proposed layout for Pioche Mountain Estates shows that four townhome buildings—each containing between ten and thirteen units—and four ski club buildings were to be located on parcel A under the 2002 approval.

¶ 12 Ms. Keith sued MRD for breach of contract, breach of warranty, fraudulent inducement, tortious interference with prospective economic relations, declaratory relief, and to quiet title.[5] The parties filed cross-motions for summary judgment and the district court found in favor of MRD on all claims.

¶ 13 The district court granted summary judgment in favor of MRD on Ms. Keith's claims of breach of contract and breach of warranty because it held that MRD and Ms. Keith could not lawfully transfer ERUs that the Wasatch County Planning Commission had granted under the 2002 approval. This decision was based on the district court's interpretation of Wasatch County, Utah, Code section 16.27.10(C)(3) (Sterling 2013)[6] and on

---

[4] Wasatch County Code requires 160 acres minimum for a large development in the Mountain Zone. WASATCH CNTY., UTAH, CODE § 16.09.03 (Sterling 2013). Parcel A was about forty acres. Thus, outside of the 2002 approval, Ms. Keith officially retained only the ability to build at most two single family homes on her parcel. MRD attempted to go forward with the Pioche development on its land. MRD's parcels, B and C, together were well over 160 acres.

[5] Ms. Keith also sued Wasatch County. In 2010, to resolve the litigation, the county conditionally approved fifty-four ERUs for Ms. Keith's property. In October 2010, Ms. Keith sold her property to a third party.

[6] Previously codified at WASATCH CNTY., UTAH, CODE § 16.27.10(3)(c) (Sterling 2010).

its finding that MRD and Ms. Keith abandoned the development plan and decided to develop their respective parcels separately.[7]

¶ 14  The district court granted summary judgment in favor of MRD on Ms. Keith's claim for fraudulent inducement because it found that Ms. Keith did not present sufficient evidence of the elements required for fraudulent inducement. The court found that Ms. Keith presented (1) no evidence that MRD "made any representation about apportionment or transfer of ERUs which [Ms.] Keith relied upon in entering into the settlement agreement," and (2) no evidence that MRD intended to deceive Ms. Keith when the parties entered into the settlement agreement.

¶ 15  Finally, the district court concluded that as a matter of law, under the undisputed facts, MRD did not tortiously interfere with Ms. Keith's contractual interests by an improper means or for an improper purpose.  According to the court, "MRD had a proper purpose for asserting that it did not transfer ERUs to Keith," specifically, its "genuinely held belief" that it did not transfer any ERUs to Ms. Keith in the settlement agreement.  The

---

[7] The district court interpreted the Wasatch County Code phrase, "Preliminary approvals shall be for the entire property," to mean that in the 2002 preliminary approval the Wasatch County Planning Commission allocated 183 ERUs for the entire 321-acre property—parcels A, B, and C.  The district court reasoned that "[t]he only right to ERUs transferred to Keith under the settlement agreement was conditioned upon development of parcels A, B, and C consistent with the 2002 preliminary plan."  But the district court found that Ms. Keith and MRD had abandoned the preliminary plan by settling the partition action.  The district court further concluded that any transfer of ERUs from MRD to Ms. Keith in the settlement agreement was legally impossible because reallocation of ERUs for separately planned and developed parcels is a government function.  Finally, the district court concluded the settlement agreement did not transfer ERUs to Ms. Keith even if it were legally possible to do so.  It reasoned that because MRD and Ms. Keith never agreed upon the "number of ERUs to be allocated to their respective parcels, or the method by which this number would be ascertained," there was no "meeting of the minds as to this material term" and the settlement agreement was "unenforceable."

court concluded that MRD "did not utilize improper means in expressing its opinion" about the ERUs because MRD merely expressed views "regarding the import of legal documents to public officials at planning meetings in connection with the planning process." Ms. Keith appeals the district court's decision to grant summary judgment on her claims for breach of contract, breach of warranty, fraudulent inducement, and tortious interference with prospective economic relations. We find that the district court properly granted summary judgment in favor of MRD on all claims and therefore affirm.

## ISSUES AND STANDARD OF REVIEW

¶ 16 Ms. Keith appeals the district court's grant of summary judgment in favor of MRD and corresponding dismissal of all of Ms. Keith's claims. We review a district court's grant of summary judgment for correctness and "accord no deference to [its] conclusions of law."[8] Summary judgment is appropriate only if "there is no genuine issue as to any material fact" and "the moving party is entitled to a judgment as a matter of law."[9] In evaluating whether the district court correctly concluded that there were no genuine issues of material fact, we construe the facts and any inferences drawn from those facts in the light that is most favorable to the nonmoving party, Ms. Keith.[10]

¶ 17 Ms. Keith also appeals the district court's denial of her motion for summary judgment on her breach of contract claim. When a district court interprets a deed as a matter of law, "we accord its construction no particular weight, reviewing its action under a correctness standard."[11] "Whether a contract" or a deed

---

[8] *Torian v. Craig*, 2012 UT 63, ¶ 13, 289 P.3d 479.

[9] Utah R. Civ. P. 56(c).

[10] *Peterson v. Sunrider Corp.*, 2002 UT 43, ¶ 13, 48 P.3d 918. When there are cross-motions for summary judgment, we view the facts in the light most favorable to the losing party. *See Cabaness v. Thomas*, 2010 UT 23, ¶¶ 2–3, 232 P.3d 486.

[11] *Selvig v. Blockbuster Enters., LC*, 2011 UT 39, ¶ 18, 266 P.3d 691 (internal quotation marks omitted); *see also Stern v. Metro. Water Dist.*, 2012 UT 16, ¶ 21, 274 P.3d 935; *Ault v. Holden*, 2002 UT 33, ¶ 37, 44 P.3d 781; *Cornish Town v. Koller*, 758 P.2d 919, 921

"is ambiguous is a question of law, which we review for correctness."[12] If an ambiguity exists in the deed, then there is a "factual issue as to what the parties intended," and summary judgment would generally be inappropriate.[13]

## ANALYSIS

¶ 18   Ms. Keith argues that MRD improperly made statements and proceeded as though it had retained all of the ERUs in the 2002 approval because she believes that forty-eight ERUs were conveyed to her by the special warranty deed. She supports her position by citing (1) language from MRD's 2004 settlement offer that suggested her future retention of ERUs, (2) the fact that she paid for water rights in the amount of forty-eight ERUs on parcel A, and (3) a comparison of her land map with the Pioche development map from the 2002 approval, showing the planned location of buildings and lots. We disagree and therefore affirm the district court's summary judgment ruling.

## I. BREACH OF CONTRACT

¶ 19   Ms. Keith asserts that the district court erred when it granted summary judgment to MRD on her breach of contract claim.[14] She argued below, and renews her argument on appeal,

---

(Utah 1988) ("[I]n the absence of ambiguity, the construction of a deed is a question of law for the court.").

[12] *Peterson*, 2002 UT 43, ¶ 14; *see also Kimball v. Campbell*, 699 P.2d 714, 716 (Utah 1985) ("A contract's interpretation may be either a question of law, determined by the words of the agreement, or a question of fact, determined by extrinsic evidence of intent.").

[13] *Peterson*, 2002 UT 43, ¶ 14 (internal quotation marks omitted); *accord RHN Corp. v. Veibell*, 2004 UT 60, ¶ 40, 96 P.3d 935 ("[E]xtrinsic evidence is admissible to illuminate the intent of the parties if the terms of a deed are ambiguous." (internal quotation marks omitted)).

[14] Ms. Keith also appeals the district court's grant of summary judgment on her claim of breach of warranty. But she fails to make any argument that MRD breached a covenant of title. *See, e.g., Sanpete Am., LLC v. Willardsen*, 2011 UT 48, ¶¶ 60–62, 269 P.3d 118 (explaining that by law, warranty deeds include certain

that MRD breached the terms of the "2005 Settlement Agreement by refusing to confirm . . . the division of the ERUs that was agreed to." Ms. Keith argues that "the terms of the 2005 Settlement Agreement were contained in three documents"—Ms. Keith's letter making the offer, MRD's letter accepting that offer, and the deeds themselves.[15] MRD agrees that "these documents constitute the sum total of the parties' agreement" and characterizes the "contract at issue" as the "settlement agreement," which it states "was effected by the exchange of deeds." Neither party raised the doctrine of merger, which "provides that upon delivery and acceptance of an unambiguous deed, all prior negotiations and agreements are deemed merged therein."[16] We will ignore this omission, however, because the contents of the two letters—Ms. Keith's offer and MRD's acceptance—neither materially add to nor detract from the language in the special warranty deeds.[17]

---

covenants of title). Both because Ms. Keith failed to brief her breach of warranty claim and because the claim appears to have no merit, we will not address it. *See id.* ¶ 64 n.14 ("We will not address inadequately briefed issues"). A special warranty deed is a deed "in which the grantor covenants to defend the title against only those claims and demands of the grantor and those claiming by and under the grantor." BLACK'S LAW DICTIONARY 477 (9th ed. 2009). Since Ms. Keith did not allege a title defect, her claim for breach of warranty fails as a matter of law and was appropriately dismissed.

[15] Technically, this would be four documents.

[16] *Nelson v. Gregory Cnty.*, 323 N.W.2d 139, 141 (S.D. 1982); *accord Spears v. Warr*, 2002 UT 24, ¶ 13, 44 P.3d 742 ("The merger doctrine, as a general rule, declares that on delivery and acceptance of a deed the provisions of the underlying contract for the conveyance are deemed extinguished or superseded by the deed." (internal quotation marks omitted)), *abrogated on other grounds by Tangren Family Trust v. Tangren*, 2008 UT 20, ¶ 16 n.20, 182 P.3d 326.

[17] Ms. Keith's 2005 settlement offer, which MRD accepted, consisted of one sentence stating only that Ms. Keith "would trade her interest in all other parcels if [MRD] would convey to her a

¶ 20 Ms. Keith appears to conflate two legal theories. Ms. Keith argues (1) that the parties *intended* to include the ERUs granted by the county in the 2002 approval in their agreement and in the deeds and (2) that the ERUs were in fact included in the deed's unambiguous language. To the extent she implies that the parties *intended* to include ERUs in the conveyance but mistakenly did not, she has inadequately briefed a request for deed reformation. Reformation of a written instrument may be proper when a party alleges that the writing did not conform to the intent of the parties.[18] However, Ms. Keith has not asked us to reform the deed, nor has she argued any of the three justifications for reformation: (1) mutual mistake, (2) unilateral mistake where the other party knew of the mistake and kept silent, and (3) unilateral mistake caused by the other party's fraudulent affirmative behavior.[19] Both parties confine their contract analysis to Ms. Keith's deed, which they both claim was not ambiguous and should be interpreted as a matter of law. Because Ms. Keith frames her argument as a question of deed interpretation, and because we believe this is the proper inquiry, we too will focus our attention on the deed.

¶ 21 "Deeds are to be construed like other written instruments, and where a deed is plain and unambiguous, parol evidence is not admissible to vary its terms."[20] "[C]ourts interpreting a deed should employ all appropriate tools of

---

hundred percent interest in Parcel A." To the extent that Ms. Keith suggests that this language is relevant to the parties' intent, she has not adequately briefed this claim. Ms. Keith does not explicitly argue that language in the 2005 settlement agreement has independent significance or supplements the deed language. Nor do she or MRD address the relevance of the doctrine of merger. Nevertheless, Ms. Keith's breach of contract claim arises entirely out of the deed language, and thus we will likewise confine our analysis to the deed.

[18] *Jensen v. Manila Corp. of the Church of Jesus Christ of Latter-day Saints*, 565 P.2d 63, 64–65 (Utah 1977).

[19] *See id.*

[20] *Hartman v. Potter*, 596 P.2d 653, 656 (Utah 1979); *see also Ault v. Holden*, 2002 UT 33, ¶ 37, 44 P.3d 781.

construction to arrive at the best interpretation of its language."[21] In interpreting a contract or a deed, "we look to the writing itself to ascertain the parties' intentions."[22] "Specifically, we determine the parties' intent from the plain language of the four corners of the deed."[23]

¶ 22 "[T]he intention of the parties to a conveyance is open to interpretation only when the words used are ambiguous."[24] Accordingly, "[i]f the language of the [deed] is unambiguous, the intention of the parties may be determined as a matter of law based on the language of the [deed]."[25] We hold that the language used in the special warranty deed granted by MRD to Ms. Keith was unambiguous and can be interpreted as a matter of law.

¶ 23 The language of the special warranty deeds exchanged between the parties was identical. Each deed stated, in pertinent part,

> Grantor, hereby CONVEYS AND WARRANTS specially against all claiming by, through or under Grantor, and not otherwise, to . . . Grantee . . . all of Grantor's right, title and interest in the real property in Wasatch County, State of Utah, as follows: See [attached land description] . . . Together with all the appurtenances, rights, and privileges thereunto belonging; and Subject to restrictions, reservations, covenants, conditions, easements and right-of-ways now of record, all other matters now of record, and general property taxes, assessments and charges for the year 2005 and thereafter.

¶ 24 Both parties present competing interpretations of the deed language. Namely, the parties dispute whether the deed

---

[21] *Stern v. Metro. Water Dist.*, 2012 UT 16, ¶ 33, 274 P.3d 935.

[22] *Selvig v. Blockbuster Enters., LC*, 2011 UT 39, ¶ 23, 266 P.3d 691 (internal quotation marks omitted).

[23] *Ault*, 2002 UT 33, ¶ 38.

[24] *Hartman*, 596 P.2d at 656; *Cornish Town v. Koller*, 758 P.2d 919, 921 (Utah 1988).

[25] *Peterson v. Sunrider Corp.*, 2002 UT 43, ¶ 18, 48 P.3d 918.

language granted the ERUs contained in the 2002 approval. Though the parties disagree about the meaning of the deed language "rights, and privileges," this does not mean that the deed is ambiguous.[26] A deed's language is ambiguous only if the parties have both advanced a "tenable" interpretation of the language.[27] "[A] party cannot make a successful claim of ambiguity based on usage of a term that is not reasonable or is the product of forced or strained construction."[28]

¶ 25 Ms. Keith argues that the deed language granting "all of Grantor's right, title and interest" in the real property, "together" with all "appurtenances, rights, and privileges" and "[s]ubject to . . . all other matters now of record" includes development rights. Specifically, she argues that the density (ERUs) allocated to the undivided property in the 2002 approval was an independent right that "vested" in her parcel and survived the transfer of ownership. Ms. Keith invokes the vested rights doctrine and argues that the 2002 approval created property rights that vested in her parcel and were accordingly "rights" and "privileges" as stated in the deed. We must therefore determine whether the ERUs were a "vested right" that attached to parcel A and would have run with the land.[29] We hold that, under these circumstances, they were not; and therefore Ms. Keith's

---

[26] *Winegar v. Froerer Corp.*, 813 P.2d 104, 109 (Utah 1991) ("[T]he fact that the parties differ as to the interpretation of an agreement does not alone establish that ambiguity exists."); *see also Stern*, 2012 UT 16, ¶ 21 n.7 (court will apply "all relevant tools of construction" before deeming a deed "ambiguous" such that extrinsic evidence of intent becomes relevant).

[27] *Daines v. Vincent*, 2008 UT 51, ¶ 30, 190 P.3d 1269 (internal quotation marks omitted).

[28] *Id.* ¶ 30 n.5 (internal quotation marks omitted).

[29] We caution that this case does not present the question of whether or when the provisions of a county's development approval become "vested rights" such that the county can no longer take them away. Here we are asked to determine whether ERUs granted by a county in a development approval are "rights" as between the private parties, not with regard to the government.

interpretation of the deed is not reasonable and her breach of contract claim fails as a matter of law.

¶ 26 We first discuss the nature of a preliminary development approval and its attendant ERUs. We then determine that the deed did not include the development rights granted by the 2002 approval. Finally, we conclude that Ms. Keith's interpretation of the deed language is not reasonable. The plain language of the deed does not and cannot under these circumstances include the provisional rights granted by the county in the 2002 approval.

¶ 27 In order to develop property in Wasatch County, as in most counties, a developer must obtain a permit from the county. Wasatch County imposes different restrictions depending on the size of the development, the nature of the development, and the "zone" that it is in. Each zone has permitted principal uses and permitted conditional uses. Conditional uses are allowed only if the county grants the developer a conditional use permit. The property at issue in this case was in the "Mountain Zone," and thus under Wasatch County Code any uses that are part of a "planned performance development"[30] (for example, the construction of multi-family residences, ski lodges, or hotels) are conditional uses and would require a conditional use permit. Additionally, the county code states that planned performance developments in the Mountain Zone must have a minimum of 160 acres.[31]

---

[30] The Wasatch County Code does not explicitly define "planned performance development" but states generally that the "purpose of the Planned Performance Developments Chapter is to encourage imaginative and efficient utilization of land, to develop a sense of community, and to ensure compatibility with the surrounding neighborhoods . . . This is accomplished by providing greater flexibility in the location of buildings on the land, the consolidation of open spaces and clustering of dwelling units." WASATCH CNTY., UTAH, CODE § 16.29.01 (Sterling 2013). In 2010, the code also stated that planned performance developments were specifically applicable to only two zones, one of which was the Mountain Zone. *Id.* § 16.29.02 (Sterling 2010).

[31] *Id.* §§ 16.09.03, 16.29.08 (Sterling 2013).

¶ 28 ERU is another way of saying population density.[32] The Wasatch County Code defines ERUs as "[t]he number of residential equivalents to determine density based on sewer, water and square footage of a structure."[33] Under the Utah Code, an ERU is "a dwelling, unit, or development that is equal to a single-family residence in terms of the nature of its use or impact on an improvement to be provided in the assessment area."[34]

¶ 29 Finally, we note that the Wasatch County Code also states that "[a] conditional use permit is transferable with the title to the underlying property so that an applicant may convey or assign an approved project without losing the approval *so long as all conditions continue to be met*."[35] It continues, "[t]he applicant

---

[32] *See, e.g., id.* § 16.29.08(B) (Sterling 2013) ("Any mountain zone (M) development more dense than one ERU for every five (5) net developable acres must earn additional density by complying with items listed on the performance chart.").

[33] *Id.* § 16.04.02 (Sterling 2013).

[34] UTAH CODE § 11-42-102(20).

[35] WASATCH CNTY., UTAH, CODE § 16.23.06(A) (Sterling 2013) (emphasis added). Though neither party addresses expiration of the permit in their briefing, Wasatch County Code § 16.23.06(C) states that

> [u]nless otherwise specified in the motion granting a conditional use permit, a permit that has not been utilized within twelve (12) months from the approval date, shall become null and void by operation of law. Once any portion of the conditional use permit is utilized, the conditions related thereto become immediately operative and must be strictly obeyed. Utilization shall be construed to mean pouring of concrete, or commencement of framing on construction, or commencement of the use or uses for which the permit was granted.

However, because this issue has not been raised, we do not address it.

cannot transfer the permit off the site on which the approval was granted."[36]

¶ 30  "Until the rights vest on a particular piece of property, the city or state can change land-use and zoning regulations and apply the new laws to the development of the property."[37]  The vested rights doctrine is the body of law that addresses at what point development rights "vest" such that subsequent zoning changes cannot be retroactively applied.[38]  This area of law generally concerns the constitutional rights of landowners harmed by post-approval changes to county or municipal permitting and zoning regulations.[39]  The common problem seen in these cases is that a landowner or developer applies for and receives the local government's approval to build a development, takes various steps in reliance on that approval, and then the local government changes the applicable regulations to the detriment of the developer.  This is not the case here.

¶ 31  In Utah, rights in a development application vest upon submission of a completed application that conforms to the county land use and zoning ordinances in effect at the time.[40]  Thus, the submission of the Pioche Mountain Estates development plan did create certain "vested" rights in the 321 acres upon which the approval was granted.  But the right created was the

---

[36] *Id.*

[37] Thomas G. Pelham et al., *"What Do You Mean I Can't Build!?" A Comparative Analysis of When Property Rights Vest*, 31 URB. LAW. 901, 901 (1999) (footnote omitted).

[38] *See W. Land Equities, Inc. v. City of Logan*, 617 P.2d 388, 390–96 (Utah 1980) ("[A]dopting the rule that an applicant is entitled to a building permit or subdivision approval if his proposed development meets the zoning requirements in existence at the time of his application and if he proceeds with reasonable diligence, absent a compelling, countervailing public interest.").

[39] *See* John J. Delaney & William Kominers, *He Who Rests Less, Vests Best: Acquisition of Vested Rights in Land Development*, 23 ST. LOUIS U.L.J. 219, 221–22 (1979).

[40] UTAH CODE § 17-27a-508; *Western Land Equities*, 617 P.2d at 396.

right not to have the county revoke approval of the development based on a change in the applicable zoning laws.[41]   A development approval does not create independent free-floating vested property rights—the rights obtained by the submission and later approval of a development plan are necessarily conditioned upon compliance with the approved plan.

¶ 32   When a county approves property for development but then that property is sold to someone else, no additional approval is necessary "so long as the [new owner's] use [is] consistent with that that had already been approved."[42]   This rule is consistent with the Wasatch County Code, which states that "[a] conditional use permit is transferable with the title to the underlying property so that an applicant may convey or assign an approved project without losing the approval, *so long as all conditions continue to be met.*"[43]   Here, however, the conditional use permit (i.e., the 2002 approval) was for a 321-acre piece of property.   Under the 2005 settlement agreement, that property was divided into two parts—and there was no agreement between the parties to continue to develop the properties together.   Ms. Keith's forty-acre parcel was not the "underlying property"[44] upon which the approval was granted and thus the rights attendant to the approval did not survive the division.   In other words, this changed condition destroyed the approval.   Accordingly, there was no vested right that ran with parcel A.

¶ 33   Ms. Keith, as the purchaser of parcel A, did not obtain a "vested" right in the ERUs allocated under the 2002 approval because the 2002 approval applied to all three parcels.   In other

---

[41] *W. Land Equities*, 617 P.2d at 395–96 ("A property owner should be able to plan for developing his property in a manner permitted by existing zoning regulations with some degree of assurance that the basic ground rules will not be changed in midstream.").

[42] *Maintain Our Desert Env't. v. Town of Apple Valley*, 15 Cal. Rptr. 3d 322, 332 (Cal. Ct. App. 2004).

[43] WASATCH CNTY., UTAH, CODE § 16.23.06(A) (Sterling 2013) (emphasis added).

[44] *Id.*

words, the density allocated to the Pioche development as a whole did not create independent rights to ERUs that attached to parcel A. Once parcel A was divorced from the property that was the subject of the approval, and in the absence of any agreement to continue to develop the properties together under the approved plan, Ms. Keith did not retain any right to hold on to ERUs granted under the approval. Accordingly, the deed's language granting "rights and privileges" could not have included the ERUs. Ms. Keith asks us to hold that provisions of a development approval vest in and run with the land even when that land has been divided and the separate owners no longer agree to develop the property in accordance with the approval. This argument fails as a matter of law. Accordingly, Ms. Keith's interpretation of the deed language is not reasonable.

¶ 34 We note further that a county's approval of a development plan and the corresponding assignment of density (ERUs) is not a matter that is within the control of private parties. The county regulations themselves contradict Ms. Keith's interpretation of the deed language by stating that development approvals made for one piece of land cannot be transferred to a different piece of land.[45] Insofar as Ms. Keith's deed was for a different, smaller piece of land than the land upon which the development approval was granted, and because she was not working together with MRD to comply with the conditions of the approval, the county's regulations extinguished any right Ms. Keith might have had to ERUs granted in that approval.

¶ 35 Ms. Keith makes a number of arguments concerning the parties' alleged intent to include ERUs when they exchanged the deeds.[46] But it is not appropriate for us to evaluate the parties'

---

[45] *Id.* ("The applicant cannot transfer the permit off of the site on which the approval was granted.").

[46] For example, Ms. Keith contends that the parties intended to include ERU allocation in their contract by pointing to the 2004 settlement offer, in which MRD's predecessor proposed that the parties could exchange interests in the properties and then continue working together on the development plan, and that Ms. Keith would "share in such costs based upon our proportionate densities." Ms. Keith, however, rejected that offer. Ms. Keith mischaracterizes the record when she states that her

intent unless the language on the face of the deed is ambiguous—
which it is not.[47]

¶ 36 Ms. Keith also appears to argue that the ERUs constituted a covenant that runs with the land. Ms. Keith's briefing of this argument is inadequate, as she fails to provide "reasoned analysis" and instead provides only "bald citations"[48] to support her assertion that the parties "were conveying the rights and interests that existed in the property," which "included . . . the ERUs that had already been allocated" under the 2002 approval. Ms. Keith points out that some courts have found that density restrictions and open space agreements can sometimes constitute covenants that run with the land.[49] She fails to brief the law of real covenants, however, and if she had, she would have noted the basic rule that a covenant that runs with the land is "a *formal* agreement or promise . . . to do or not do a particular act."[50]

---

"eventual offer to settle the partition litigation was the same offer that was made in the course of these prior negotiations with MRD." It was not.

[47] *Ault*, 2002 UT 33, ¶ 38 ("[W]e determine the parties' intent from the plain language of the four corners of the deed."); *see also Stern*, 2012 UT 16, ¶¶ 59–60.

[48] *Allen v. Friel*, 2008 UT 56, ¶ 9, 194 P.3d 903 (internal quotation marks omitted). For example, Ms. Keith cites *Raymond v. Holliday*, No. 297146, 2011 WL 2462671, at *2, *3 (Mich. Ct. App. June 21, 2011) for the proposition that "density restrictions are covenants that run with the land." But in that case the Michigan Court of Appeals held that a contract containing an explicit promise that the grantee would build only one building per ten acres was a covenant running with the land. *Id.* Ms. Keith fails to explain how this case is similar to her own, and indeed it is readily distinguishable because here Ms. Keith does not allege the existence of any of the elements of a real covenant.

[49] *See, e.g.*, *Canyon Meadows Home Owners Ass'n v. Wasatch Cnty.*, 2001 UT App 414, 40 P.3d 1148 (addressing whether an open space agreement was a covenant that ran with the land).

[50] BLACK'S LAW DICTIONARY 419 (9th ed. 2009) (emphasis added).

Here, Ms. Keith has failed to address any of the four characteristics of a real covenant[51] and thus has failed to adequately brief this argument. Accordingly, we are unpersuaded by the argument and will not address it beyond saying that even if Ms. Keith had properly briefed this claim, she almost certainly would not have been able to prove the elements of a real covenant.[52]

¶ 37 Finally, Ms. Keith has not alleged that the parties had a separate agreement to continue to develop the properties together in accordance with the development plan—which is the only way that the 2002 approval could have remained viable and in effect. To the contrary, Ms. Keith acknowledged that when she entered the settlement, she believed that each party would "be able to proceed independently of one another to develop their parcels." In a deposition on September 26, 2011, Ms. Keith acknowledged that there was no agreement between the parties to follow the development plan.[53] As MRD points out, "the very cause of the

---

[51] *Flying Diamond Oil Corp. v. Newton Sheep Co.*, 776 P.2d 618, 622–23, 629 (Utah 1989) (stating that "(1) The covenant must 'touch and concern' the land; (2) the covenanting parties must intend the covenant to run with the land"; (3) "there must be privity of estate"; and (4) the covenant "must be in writing").

[52] This is because (1) the ERUs most likely do not "touch and concern" the land because they are a conditional benefit granted by Wasatch County, which is dependent on compliance with the approved development plan—compliance that was lacking here; (2) Ms. Keith has pointed to no evidence of MRD's intent to covenant, express or otherwise; and (3) the purported covenant was not put into writing. *See id.*, 776 P.2d at 623.

[53] Q: Did you have an understanding one way or the other whether or not the development would proceed forward jointly between you . . . and Talisker [MRD] after a partition order was entered?

Keith: Well, my understanding was that the development would continue, but I would be in charge of Parcel A, they would be in charge of Parcels B and C.

Partition Action" was "the parties' inability to reach an agreement regarding joint development of the property." We hold that absent any agreement to develop the properties together, the provisions of the 2002 approval were no longer in effect and MRD did not breach the settlement agreement or the terms of the deed.

¶ 38 In sum, because (1) the 2002 approval was granted for the entire 321 acres, (2) the property was divided, (3) the parties failed to follow the conditions of the development plan, (4) there was no contract between the parties to continue to follow the plan, and (5) the plain language of the deed did not address a development right like ERUs, the provisional rights granted by the 2002 approval were extinguished and there was no breach of contract. The plain deed language conveying parcel A to Ms. Keith with all of its "rights and privileges" does not include conditional rights granted by the development approval. Moreover, the deed language cannot reasonably be interpreted to mean that the parties intended to do something that they did not have the ability to do—namely, alter the county's conditional use permit.[54] The only way that the 2002 approval would have remained viable, according to Wasatch County regulations, was "*so long as all conditions continue[d] to be met*" and only on "the site

---

Q: Could the development, in fact, go forward, then, if you disagreed with what they were proposing for Parcel A?

Keith: Well, they wouldn't have a voice in proposing anything on Parcel A.

. . .

Q: So you understood that they could do what they wanted with their ground and you could do what you wanted with your ground?

Keith: Precisely.

Q: And there would not be a joint development?

Keith: Right.

[54] *See* RESTATEMENT (THIRD) OF PROP.: SERVITUDES § 1.1(1), (3) (2000) ("A servitude is a legal device that creates a right or obligation that runs with land or an interest in land. . . . Zoning and other public land-use regulations . . . are not servitudes . . . .").

on which the approval was granted."[55] The parties refused to develop their now separately owned property together and no rights from the 2002 approval could have survived this drastic change in circumstances.

¶ 39 Because Ms. Keith's interpretation of the deed language was not reasonable, the deed was unambiguous as a matter of law. And the unambiguous language of the deed did not reference county development rights or the Pioche development plan. Summary judgment was appropriately granted to MRD on Ms. Keith's breach of contract claim because the undisputed facts, construed in favor of Ms. Keith, nevertheless show that MRD did not breach the contract as a matter of law. Accordingly, we affirm the district court's dismissal of Ms. Keith's breach of contract claim.

## II. FRAUDULENT INDUCEMENT

¶ 40 Ms. Keith made a claim for fraudulent inducement based upon representations made to her during the "parties' prior course of dealing." As she cannot point to a false representation made by MRD, this claim has no merit and we thus affirm the district court's ruling.

¶ 41 To prevail on a claim of fraudulent inducement, a plaintiff must establish:

> (1) that a representation was made (2) concerning a presently existing material fact (3) which was false and (4) which the representor either (a) knew to be false or (b) made recklessly, knowing that there was insufficient knowledge upon which to base such a representation, (5) for the purpose of inducing the other party to act upon it and (6) that the other party, acting reasonably and in ignorance of its falsity, (7) did in fact rely upon it (8) and was thereby induced to act (9) to that party's injury and damage.[56]

---

[55] WASATCH CNTY., UTAH, CODE § 16.23.06(A) (Sterling 2013) (emphasis added).

[56] *Daines v. Vincent*, 2008 UT 51, ¶ 38, 190 P.3d 1269 (internal quotation marks omitted).

Ms. Keith fails to demonstrate any evidence that MRD made a false representation and her claim fails on that basis alone.

¶ 42  Ms. Keith cites generally to the parties' correspondence, which spans a five-year period from 1999 through 2004 and chronicles her negotiations with the company that is now MRD. In her complaint, Ms. Keith focuses in particular upon a 2004 offer made by MRD's predecessor, Capital Growth Partners (2004 settlement offer).  In the 2004 settlement offer, Capital Growth Partners offered to exchange interests in the various parcels, to the effect that Ms. Keith would receive a complete interest in some twenty-seven acres that would "includ[e] any and all appurtenant benefits thereto such as . . . water rights."  Ms. Keith rejected that offer.  Nevertheless, she argued below that because ERUs are associated with water rights, the use of the term "water rights" in the 2004 offer letter was a knowing misrepresentation that was aimed at inducing her to enter into the 2005 settlement agreement, which *she* drafted.  Ms. Keith fails to mention that she drafted the 2005 settlement agreement and fails to mention that she rejected the offers that MRD/Capital Growth Partners made in 2004.  It is difficult to see how MRD could have fraudulently induced Ms. Keith to enter a contract that Ms. Keith herself drafted. Moreover, any statements made in settlement offers that Ms. Keith rejected in 2004 could not possibly have induced her to enter the settlement agreement she drafted over a year later; an agreement that made no mention of water rights, ERUs, or the Pioche development.

¶ 43  "Rather than offer evidence satisfying the fraud standard in [her] appeal, [Ms. Keith] does little more than color the fraud elements with conjectural allegations based on [her] subjective experience of the transaction. We have held that, mere conclusory allegations in a pleading, unsupported by a recitation of relevant surrounding facts, are insufficient."[57]  Accordingly, Ms. Keith's fraudulent inducement claim fails as a matter of law and we affirm the district court's summary judgment ruling.

---

[57] *Id.* ¶ 39 (internal quotation marks omitted).

## III. TORTIOUS INTERFERENCE WITH PROSPECTIVE ECONOMIC RELATIONS

¶ 44 Ms. Keith argues that the district court erred when it granted summary judgment in favor of MRD on her claim of intentional interference with prospective economic relations. She argues that MRD committed this tort when it asserted, immediately following the settlement in 2005 and for some time thereafter, that it was entitled to all of the ERUs granted in the preliminary development plan, and that they were valuable, vested rights that MRD had retained in its property only. Ms. Keith argues that MRD "actively sought to prevent Ms. Keith from moving forward with the entitlement of her property . . . without any legitimate need to do so" in order to "improperly damage Ms. Keith."

¶ 45 In order to recover damages for intentional interference with prospective economic relations, "the plaintiff must prove (1) that the defendant intentionally interfered with the plaintiff's existing or potential economic relations, (2) for an improper purpose or by improper means, (3) causing injury to the plaintiff."[58]

¶ 46 To show an improper purpose, "the plaintiff must prove more than a defendant's motivation of ill will toward the plaintiff; [r]ather, the plaintiff must show that the defendant's predominant purpose was to injure the plaintiff."[59] When a party is "reasonably acting to protect a legitimate economic interest of its

---

[58] *Leigh Furniture & Carpet Co. v. Isom*, 657 P.2d 293, 304 (Utah 1982). We note that a challenge to the "improper purpose" element of Utah's intentional interference with prospective economic relations cause of action has been fully briefed and is currently under advisement before this court. *Eldridge v. Johndrow*, No. 20130263 (Utah filed Oct. 17, 2013). We do not address the future viability of the improper purpose element today because it was not raised or briefed by the parties in this case. Moreover, because we affirm the grant of summary judgment on this issue, the question presented in *Eldridge* would not change the outcome of this case one way or the other.

[59] *Ferguson v. Williams & Hunt, Inc.*, 2009 UT 49, ¶ 35, 221 P.3d 205 (alteration in original) (internal quotation marks omitted).

own," this is not an improper purpose.[60] "Improper means are present where the means used to interfere with a party's economic relations are contrary to law, such as violations of statutes, regulations, or recognized common law rules. Improper means include violence, threats or other intimidation, deceit or misrepresentation, bribery, unfounded litigation, defamation, or disparaging falsehood."[61]

¶ 47 MRD stated that it took the actions it did because it believed, accurately, as it turns out, that because Ms. Keith's property did not meet the 160-acre requirement for a development in the Mountain Zone, it did not qualify for more than the standard amount of ERUs (in this case, two lots of record) without a variance. MRD further claimed that it mistakenly believed that it held all approvals and entitlements under the 2002 approval. Even if MRD harbored ill will towards Ms. Keith, MRD's statements were made in pursuit of its own economic interest. Thus, its statements were not made for the predominant purpose of injuring Ms. Keith.[62] Accordingly, Ms. Keith failed as a matter of law to establish improper purpose or improper means under *Leigh Furniture* and her claim of intentional interference with prospective economic relations was properly dismissed on summary judgment.

## CONCLUSION

¶ 48 The terms of the deed were unambiguous. Land development rights, which are a conditional right granted and controlled by the county government, are not included as a matter of law in a deed's general terms of conveyance giving a grantee the "rights and privileges thereunto belonging" to a piece of real property. Because Ms. Keith and MRD did not agree to continue to develop their properties in compliance with the 2002 development plan as approved by Wasatch County, there was no reasonable basis for Ms. Keith to believe that she would retain some amount of ERUs as detailed in that plan. Even if Ms. Keith had argued for deed reformation, a unilateral mistake is generally

---

[60] *Leigh Furniture*, 657 P.2d at 305.

[61] *Overstock.com, Inc. v. SmartBargains, Inc.*, 2008 UT 55, ¶ 18, 192 P.3d 858 (internal quotation marks omitted).

[62] *See, e.g., Ferguson*, 2009 UT 49, ¶ 35.

not grounds to reform a deed.[63]  Thus, MRD did not breach the terms of the deed and summary judgment was appropriate. Additionally, Ms. Keith's claims for fraudulent inducement and intentional interference with prospective economic relations fail because she did not allege facts sufficient to satisfy the elements of those causes of actions.  We affirm the district court's grant of summary judgment on all claims.

––––––––––––

––––––––––––

[63] *See, e.g.*, *RHN Corp. v. Veibell*, 2004 UT 60, ¶ 36, 96 P.3d 935; *Guardian State Bank v. Stangl*, 778 P.2d 1, 4–6 (Utah 1989).